WITTY v. SOUTHERN PAC. CO. et al.

(Circuit Court, S. D. California. August 31, 1896.)

No. 635.

**1. ARREST—OFFER OF REWARD.**

Three men, in search of certain criminals for whose arrest a reward had been offered, fired upon and wounded one of them, who was concealed behind a pile of straw, so that the extent of his injuries was unknown. One of the attacking party, being also wounded, was conveyed to a distant town by another, who returned next morning, accompanied by a deputy sheriff and others. The third member of the original party remained on watch near the straw pile, all night, to prevent the criminal's escape. The deputy sheriff, with other persons, approached the straw pile, and, finding the wounded man utterly incapable of offering the least resistance, formally arrested him. *Held,* that the arrest was in fact ef-

fected before the deputy's arrival, and the latter was not entitled to claim the reward.

2. SAME—ARREST BY DEPUTY SHERIFF—RIGHT TO REWARD.

It is the duty of a deputy sheriff, when specific information is conveyed to him that a felon is at a particular place within his jurisdiction, to take measures for his prompt apprehension, and he cannot claim that an arrest thus effected is made in his private capacity, so as to entitle him to a reward offered by private parties. Russell v. Stewart, 44 Vt. 170, distinguished. Warner v. Grace, 14 Minn. 487 (Gil. 364), followed.

3. SAME—ESTOPPEL TO CLAIM REWARD.

A criminal, for whose arrest defendants had offered a reward, was wounded and disabled by a private searching party, one of whom kept watch over him, but did not actually seize him. A deputy sheriff afterwards arrived and formally arrested him. On the day after the arrest the deputy stated to an agent of defendants that only those who made the fight were entitled to the reward, and that he himself would not claim any part of it. Thereupon the entire amount was paid to the searching party. *Held*, that the deputy was estopped from thereafter claiming the reward for himself.

This was an action at law by George W. Witty against the Southern Pacific Company and Wells, Fargo & Co., to recover a reward for making an arrest. The case was tried to the court without a jury.

M. E. C. Munday and Hannah & Miller, for plaintiff.
Wm. F. Herrin and E. S. Pillsbury, for defendants.

WELLBORN, District Judge. Plaintiff sues to recover $5,000 as a reward for the arrest and delivery to the sheriff of Tulare county, Cal., of one John Sontag. The defenses to the action are as follows: (1) A denial that plaintiff made the arrest of Sontag; (2) a special plea in bar, that plaintiff was a deputy sheriff of Tulare county, and for that reason cannot recover; (3) another special plea in bar, that plaintiff is estopped from claiming the reward by his declarations, made immediately after the arrest and delivery of Sontag.

The facts of the case are chiefly these: Defendants, in September, 1892, jointly offered a reward of $10,000 for the arrest and delivery to the sheriff of Fresno or Tulare counties of John Sontag and Chris Evans, or $5,000 for the arrest and delivery to either of the said sheriffs of either said John Sontag or Chris Evans,—said reward to be payable on said delivery. On the 11th of June, 1893, George E. Gard, H. L. Rapelje, H. E. Jackson, and Thomas Burns, who were in pursuit of said outlaws, had an encounter with them, about 16 or 18 miles towards the foothills from Visalia, in Tulare county, Cal. The fight occurred in the evening, about or just before dusk. Gard and his associates were in a cabin at the beginning of the fight, and, on discovering Evans and Sontag approaching the cabin, opened fire on them. The outlaws got behind an old pile of straw, about 80 yards off, and commenced firing upon the cabin. A number of shots were exchanged between the parties, and the firing then ceased. Evans and Sontag lay behind the straw pile until dusk, when Evans jumped up and ran away. During the fight, Jackson, one of Gard's party, was shot in the leg, and Sontag through the shoulder. A wagon was procured from a neighboring

ranch, and Rapelje, with two men from the ranch, took Jackson to Visalia, starting about 9 o'clock. Gard remained behind to watch the straw pile, and the man who was lying under it, whom he knew was wounded. For this purpose, Gard, with his gun, stationed himself about 70 or 75 yards distant from the straw pile, and remained there during the night, for the purpose, as shown by his uncontradicted testimony, of "guarding the party in the straw pile." At no time during the night was Sontag out of the reach of Gard's shotgun. It is true that, when the plaintiff and Rapelje and those with them reached the cabin the following morning, Gard was off 150 yards or more from the straw pile; but Gard clearly explains that he did not leave the point where he had remained during the night until he saw plaintiff and Rapelje and others come up with their teams, and then he left said point, going back over the path by which he had reached the said point, in search for a pistol which he had lost, and which he found. Gard and Burns in some way became separated after the fight, and Burns spent the night at a house a mile and a half from where the fight occurred. Rapelje, on reaching Visalia, told plaintiff of the fight which had occurred, and of its results, so far as they were known to him. Plaintiff and two other persons, William English and Samuel Stingley, at Rapelje's request, procured a team and wagon, and drove out to the locality of the fight. Four other persons, among them a newspaper reporter and a photographer, went out immediately behind plaintiff and his party. There are some discrepancies in the testimony as to details of what occurred after the parties named reached the cabin. However, there is no dispute but that plaintiff, English, and Stingley, immediately thereafter, went up to the straw pile, and there discovered Sontag, in a prostrate condition, and partially covered with straw. He was seriously wounded,—shot through the shoulder,—and unable to move himself. He died some two or three weeks afterwards, from blood poisoning or the immediate effects of his wound. Speaking of his condition, Gard says:

"The man never made any exertion, apparently, to try to help himself, that I saw. The canteen was held to his mouth, and he was laying back this way, and the canteen was tipped up to his mouth, and he drank that way a few swallows, and then they took it away from him, and directly they gave him some more, and somebody gave him some whisky eventually."

While there is some conflict as to the exact condition of Sontag, when the parties went up to him, I am satisfied that he was in a condition of helplessness, and utterly without ability or intention to make any resistance. The occurrences at the straw pile, after plaintiff and others reached it, are thus stated by plaintiff:

"I went up to Sontag, and, as I said, I was informed it was Chris Evans; and as I went up to him, he knelt down over him. He had a pistol in his left hand, a 44 Colt—a 44 Smith & Wesson, cocked. I put my left knee right on that hand, and reached over for his other hand; and, as I reached over, he says, 'Don't.' 'Well,' I says, 'you showed me a whole lot of mercy when you had me.' * * * I says, 'You showed me a whole lot of mercy when you had me shot down,' I says. And at that time I thought it was Chris Evans. And, after I had him disarmed, and took his pistol, told him that he was my prisoner, he says, 'George, you are mistaken.' I says, 'I see I am now.' I said, 'I thought it was Chris Evans.' And I said, 'Sontag, I am sorry the way I spoke to you, but I thought it was Chris at first.'"

Sontag was then placed in a spring wagon, and carried to Visalia,. and committed to the custody of a deputy sheriff and jailer, and placed in the jail. Plaintiff, during all the times mentioned, was, and had been continuously for two years before, deputy sheriff of Tulare county. Some time prior to June 12, 1893, plaintiff went to W. F. Hall, the under sheriff, or chief deputy, and said that he wanted to "form a posse and go out and hunt for Sontag and Evans." The chief deputy replied that if he did so it would be on his own responsibility, and the sheriff's office would not pay any of the expenses. On the morning of the 12th of June plaintiff again went to said Hall, and told him "that he wanted to go out to the stone corral, and search for Sontag." Hall, in testifying to his reply, says, "I just remarked, then, that he remembered what I told him the other day,—that we still adhered to that position." The horses used by plaintiff on the trip belonged to the sheriff's office. As to who paid for the carriage, it is difficult to determine from the evidence. The hire of the carriage which brought Sontag to Visalia was paid by Rapelje, the amount being $5. At the times mentioned, and for several months before, there were in the sheriff's office at Visalia warrants for the arrest of Evans and Sontag. Plaintiff testified that he did not remember having seen them. After the wagon, in which Sontag was placed, started for Visalia, plaintiff went in another direction to a small town, some distance from the road, to serve three or four papers, telling the men in the wagon to drive on slowly towards Visalia, and wait for him about three miles outside of the last-named town, which was accordingly done. In serving said papers, plaintiff acted in his official capacity as deputy sheriff. On the morning of the 13th of June, 1893, plaintiff had an interview, in Visalia, with J. M. Thacker, who was special agent of Wells, Fargo & Co., and known to the plaintiff as such. In this interview, plaintiff stated that he did not consider that any one had a right to claim the reward, except the men who made the fight, and he would not claim any part of the same. Shortly after Sontag's arrest, Gard, for himself and associates, applied to defendants for payment of the offered reward. Defendants referred the matter, for determination, to their attorney, E. S. Pillsbury. Thacker communicated to Pillsbury the declarations that had been made by Witty, and, acting upon these declarations so far as Witty was concerned, Pillsbury directed the reward to be paid to Gard and his associates, and the payment was accordingly made. The first demand in writing made by plaintiff upon defendants, for the reward, was August 31, 1894.

1. With reference to the first of the three defenses above mentioned, my conclusion is that plaintiff did not make the arrest in question. Whatever may have been said by plaintiff, when he approached Sontag at the straw pile, it is unquestionably true that Sontag, in consequence of the wounds inflicted upon him by Gard's party, was unable to offer the slightest resistance, or make any effort at an escape. Indeed, for 10 or 12 hours previously, he was in the power and under the control of Gard. Nor is this important fact at all affected by the circumstance that Gard may not have known—indeed, did not know—the extent of Sontag's helplessness.

Through the instrumentality of Gard and his associates, Sontag was shot down, and a strict watch, requiring both courage and endurance, was kept over him by Gard, during the whole of the night of the 11th. To hold that the mere fact that Witty was the first person on the following morning to approach Sontag and formally announce to him his imprisonment, could take from Gard and his associates the credit, with its benefits, of having made the arrest, would not only do them flagrant injustice, but would transgress even technical rules of law. Plaintiff did not make the arrest. This had been done before he reached the scene of the fight. While the announcement, "You are my prisoner," or phraseology to that effect, may sometimes be a material circumstance, such was not the case when plaintiff approached Sontag. Then words were simply an idle formality. The arrest had already been accomplished, by means sterner and more effectual than vocal expressions.

2. If the arrest, however, had been made by plaintiff, I am of opinion that the fact of his being a deputy sheriff, together with the other circumstances of the case, would bar a recovery. While the office of deputy sheriff, perhaps, did not impose upon the plaintiff the duty of making a general search for Sontag, yet, when the specific information was conveyed to him that a felon was at a particular locality within his jurisdiction, it was clearly his duty to take prompt measures for the apprehension of such felon, and the law will not now permit him to claim that an arrest thus effected, pursuant to official duty, was made in his private capacity as a citizen. Herein lies the distinction between the case at bar and that of Russell v. Stewart, 44 Vt. 170, relied upon by plaintiff. Directly in point, however, is the case cited in this connection by defendants, which was an action of interpleader, to determine who was entitled to a reward which had been offered for the arrest and conviction of a certain felon. The facts were as follows:

"On the 16th of June, a man, who afterwards proved to be the one for whom the reward was offered, stopped for a short time at the house of defendant Crosley. The next day Crosley received a copy of a newspaper, in which the notice offering the reward and a description of the felon was published, and the suspicions of himself and wife were then aroused that the person who had stopped at their house the day before was the felon. * * * Crosley thereupon sent his wife to Koucher to tell him of the circumstances, and procure him to go to St. Paul and get an officer to arrest the man. This she did, and Koucher immediately went to St. Paul, to the defendant Grace, who was deputy sheriff of Ramsey county, stated to him the information he had received from the wife of Crosley, and desired him to go and arrest the man. Grace, accompanied by Koucher, to show him where the man was, went and arrested him, without process, it being in Ramsey county, lodged him in the common jail of the county, and there delivered him, three days after, to the sheriff of Carver county."

### On these facts the court said:

"A sheriff or other peace officer may probably perform services in the detection and punishment of crimes, and recovery of property stolen, which it is not his official duty to perform, and for such services may receive a reward. We will not undertake to specify what acts or services might come within this class. The act of Grace in making the arrest, under the circumstances, did not. He merely arrested the man upon the information given or 'charge made' by others. When the felon's whereabouts had been discovered

and communicated to him for the purpose of procuring him to make the arrest, if he was satisfied that the information or charge was true, it was his duty to arrest and deliver the felon to the proper authorities." Warner v. Grace, 14 Minn. 487 (Gil. 364).

The following cases, also cited by defendants, are confirmatory of the conclusion which I have announced: Pool v. Boston, 5 Cush. 219; Day v. Insurance Co., 16 Minn. 408 (Gil. 365); Gilmore v. Lewis, 12 Ohio, 281; Smith v. Whildin, 10 Pa. St. 39; Kick v. Merry, 23 Mo. 72; Davies v. Burns, 5 Allen, 349; Railroad Co. v. Grafton (Ark.) 11 S. W. 702; Brown v. Godfrey, 33 Vt. 120.

The circumstance that plaintiff did not have with him the warrant for Sontag's arrest is immaterial. His general authority as a peace officer was entirely adequate. Pen. Code Cal. § 836. See, also, as to the authority and duty of a deputy sheriff, Pol. Code Cal. §§ 865, 4176.

3. The plea of estoppel, I think, is supported by the evidence. On the morning after the arrest, plaintiff stated to the special agent of one of the defendants that he considered only those who made the fight entitled to the reward, and that he himself did not and would not claim any part of the same. Acting upon this statement, so far, at least, as concerned the plaintiff, defendants paid the reward, soon thereafter, to Gard and his associates. Plaintiff contends that these declarations of his are not an estoppel, because they involved propositions of law, and were not mere statements of facts; citing McKeen v. Naughton, 88 Cal. 462, 26 Pac. 354. That case, however, it seems to me, is against, rather than in support of, plaintiff's contention. The principle there decided was that:

"A representation, in order to work an estoppel, must generally be a statement of fact, and the statement of a proposition of law will not conclude the party making it from denying its correctness, unless it is understood to mean nothing but a simple statement of fact."

The declarations of the plaintiff, fairly construed, imply that he was not the person who made the arrest, and defendants were justified in ascribing that meaning to them. Plaintiff's declaration that he did not claim the reward was also the statement of a fact. These declarations, and the settlement made by defendants with Gard in consequence of them, I think, estop the plaintiff from now claiming the reward. Bigelow, Estop. § 445; Dolbeer v. Livingstone, 100 Cal. 617, 35 Pac. 328. There may be an estoppel without intentional fraud on the part of the person sought to be estopped. Continental Nat. Bank v. Bank of Commonwealth, 50 N. Y. 575; Thompson v. Simpson, 128 N. Y. 270, 28 N. E. 627; Mitchell v. Reed, 9 Cal. 204. Other cases, cited by defendants, and in point, are Storrs v. Barker, 6 Johns. Ch. 166; Moore v. Nye (Sup.) 21 N. Y. Supp. 94; Blodgett v. McMurtry, 34 Neb. 782, 52 N. W. 706.

Plaintiff further contends, as follows:

"The defendants cannot and ought not to be heard to complain in this case. It was the easiest matter in the world for them to have asked the sheriff of Tulare county who arrested and delivered Sontag to him. It was their plain and simple duty, and their lips should be forever closed when they failed to do their plain duty; and when they come in and invoke the doctrine of estoppel without having done so, they are without merit."

In this conclusion I cannot concur. Plaintiff was the deputy sheriff of Tulare county. He, far better than any one else connected with the sheriff's office, knew who arrested Sontag; and, if his declarations to defendant's agent implied that others than himself made the arrest, surely it cannot be said, so far, at least, as the plaintiff's claim to the reward is concerned, that it was defendants' duty to have verified his declarations by inquiries addressed to the sheriff.

Judgment will be entered for the defendants.