UNION PAC. R. CO. v. BELEK et al.

(District Court, D. Nebraska, Omaha Division. October 22, 1913.)

1. INTERPLEADER (§ 33*)—DEPOSIT IN COURT—DECREE—EFFECT.

Where a railroad company offered a reward for the apprehension of certain train robbers who were subsequently arrested by certain police officers who claimed the reward, the fact that the railroad company thereupon paid the money into court and a decree of interpleader was entered, was not such an execution of the contract between the railroad company and the officers as to deprive other claimants of the right to claim the reward as against such officers.

[Ed. Note.—For other cases, see Interpleader, Cent. Dig. §§ 68–71, 74; Dec. Dig. § 33.*]

2 INTERPLEADER (§ 32*)—RIGHT TO REWARD.

Where police officers are not entitled to share in a reward on grounds of public policy, the court, in an interpleader proceeding to determine the persons entitled to the reward, would refuse of its own motion to grant any portion thereof to such officers without such objection being raised by other claimants.

[Ed. Note.—For other cases, see Interpleader, Cent. Dig. §§ 72, 73; Dec. Dig. § 32.*]

3. REWARDS (§ 11*) — POLICE OFFICERS — ACTS IN OFFICIAL DUTY — PUBLIC POLICY.

Under Cr. Code Neb. § 283, and Comp. St. Neb. 1909, c. 13, art. 2, § 64, providing the duties of a police officer in the city of South Omaha to make arrests without warrants, it was the official duty of such officers to arrest without a warrant or reward train robbers discovered in the city, and hence for so doing they were not entitled to any part of a reward offered for the apprehension of such robbers, on grounds of public policy.

[Ed. Note.—For other cases, see Rewards, Cent. Dig. §§ 14, 15; Dec. Dig. § 11.*]

4 INTERPLEADER (§ 21*)—ADVERSE CLAIMANTS.

Where a reward offered by a railroad company for the apprehension of train robbers was claimed by various persons, and the railroad company filed a bill of interpleader, it thereby admitted title in some of the claimants and its indifference between them, and hence no part of the reward could be returned to it.

[Ed. Note.—For other cases, see Interpleader, Cent. Dig. §§ 43–45, 51; Dec. Dig. § 21.*]

5. REWARDS (§ 12*)—RIGHT TO REWARD.

A reward having been offered for the discovery of train robbers, certain school boys discovered articles thought to belong to the robbers, and agreed to keep watch over the place and report to the police. They did this, and, on subsequently discovering the approach of certain men, one of the boys ran to a saloon, summoned help, and all were present and assisted in locating the bandits and in their arrest. Held that, the police officers not being entitled to any part of the reward on account of public policy, the portion thereof applicable to the arrest of persons then seized would be awarded to the boys.

[Ed. Note.—For other cases, see Rewards, Cent. Dig. § 16; Dec. Dig. § 12.*]

6. EXTRADITION (§ 37*)—AUTHORITY TO ARREST.

The authority to hold a fugitive from justice in extradition proceedings conducted under Rev. Codes Idaho 1908, §§ 8416–8418, the culmination of which is the removal of the person to another state, is distinct from the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

authority of a peace officer to make a preliminary arrest until a proper complaint can be made and a warrant obtained.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 34, 44, 48, 50; Dec. Dig. § 37.*]

7. EXTRADITION (§ 37*)—ARREST—AUTHORITY TO HOLD PRISONER.

Peace officers are authorized to arrest without a warrant and hold a fugitive from justice for a reasonable time for the institution of extradition proceedings, provided the officer has reasonable cause to believe accused has committed a felony.

[Ed. Note.—For other cases, see Extradition, Cent. Dig. §§ 34, 44, 48, 50; Dec. Dig. § 37.*]

8. REWARDS (§ 11*)—TOWN MARSHAL—ARREST—AUTHORITY.

Rev. Codes Idaho 1908, § 7522, provides that a town marshal is a peace officer, and section 7540 declares that he may make an arrest when a person has committed a felony, although not in the marshal's presence; when a felony has in fact been committed, and the marshal has reasonable cause for believing the person arrested to have committed it; and on a charge made, on reasonable cause, of the commission of a felony by the person arrested. *Held* that where a town marshal arrested a train robber who was a fugitive from justice, and for whose apprehension a reward had been offered, stating when he went to make the arrest that he was about to arrest "a train robber," but there was no evidence showing the nature of the marshal's information, it did not appear that it was any part of his duty to make the arrest so as to preclude him from earning the reward on the ground of public policy.

[Ed. Note.—For other cases, see Rewards, Cent. Dig. §§ 14, 15; Dec. Dig. § 11.*]

9. REWARDS (§ 11*)—POLICE OFFICERS—FUGITIVE FROM JUSTICE.

Mills' Ann. St. Colo. 1912, § 7272, makes it the duty of the police officers of Denver to arrest any person fleeing from justice in any part of the state, to apprehend persons in the act of committing any offense against the laws of the state or ordinances of the city, and to arrest on view any person guilty of a breach of the city ordinances, or of any crime against the laws of the state, etc. Section 7278 also declares that such officers shall have power to pursue and arrest any person fleeing from justice in any part of the state, and to receive and execute any proper authority for the arrest or detention of criminals fleeing or escaping from other places or states. *Held*, that the authority of the police of the city to arrest a fugitive from another state is limited to the execution of a warrant for such arrest, and hence where such officers arrested, without a warrant, a train robber who was a fugitive from justice from another state, they were not deprived of the right to share in the reward on the ground that in making the arrest they but performed a part of their official duty.

[Ed. Note.—For other cases, see Rewards, Cent. Dig. §§ 14, 15; Dec. Dig. § 11.*]

Bill of interpleader by the Union Pacific Railroad Company against James Belek and others to determine the persons entitled to a reward. Fund awarded to particular claimants.

Brown, Baxter & Van Dusen, of Omaha, Neb., for defendants Briggs and others.

Edgar T. Farnsworth, of Omaha, Neb., for defendants Belek and others.

T. C. MUNGER, District Judge. The Union Pacific Railway Company filed a bill of interpleader in this court, alleging that the defend-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ants claimed a reward which it had offered "for the apprehension of each of the persons" who had engaged in the robbery of one of its trains. There were five of the robbers who were arrested subsequently and convicted. In pursuance of the bill of interpleader and of a stipulation signed by all of the parties setting forth the terms of the offer, a decree of interpleader was entered in the case, from which no appeal was prosecuted, and the railway company paid the reward into court.

Three of the robbers were arrested in Nebraska at one time, and one was arrested in Denver and one in Idaho, whence they had fled after the crimes. The offer was of a separate amount for the apprehension of each of the guilty persons, and, as the acts of arrest of some of the robbers are entirely distinct from those relating to the arrest of the others, separate bills of interpleader doubtless could have been required as to each act of apprehension and the claimants therefor. As a result of the stipulation and decree, several issues are now presented in one suit. The physical arrest of the three robbers, Woods, Torgenson, and Grigware, was made in South Omaha by certain policemen of that city. On their behalf, the claim is made that under the decision of the Court of Appeals of this circuit in McClaughry v. King, 147 Fed. 463, 79 C. C. A. 91, 7 L. R. A. (N. S.) 216, 8 Ann. Cas. 856, they alone are entitled to the reward offered for the arrest of these three robbers, because they alone assumed the personal danger and responsibility of arresting the suspects.

[1] It is conceded by counsel for these claimants that, if the arrest was made by them as a part of their official duties, they could not enforce their claim against the objection of the Union Pacific Railway Company; but they contend that as a result of the decree of interpleader, and of the deposit of the reward money in court, the contract is executed, and the other claimants may not be heard to object to the award of the money to them. The payment by the railway company was not the final execution of the contract, because the payment was not made to any particular person, but into court, and it was for the benefit only of those legally entitled thereto. Ribbans v. Crockett, 1 B. & P. 264.

[2, 3] The other claimants were then called upon to assert their claims. Nothing they have done has estopped them from such assertion, nor from denying the claims of other defendants. It is not necessary, however, that such claimants either plead or contend that the police officers are not entitled to share in the fund, for, if public policy prevents such an award, the court of its own motion must refuse the relief asked by the police officers. Coppell v. Hall, 7 Wall. 542–558, 19 L. Ed. 244; Cooper Manufacturing Company v. Ferguson, 113 U. S. 727–733, 5 Sup. Ct. 739, 28 L. Ed. 1137. Was it the duty of these officers to make these arrests? A passenger train going east upon the Union Pacific Railway had been boarded by three men at the city of Fremont, who had climbed over the tender and by the display and threatened use of firearms had compelled the engineer to stop the train at an appointed place, where two more bandits were in waiting. The five then compelled the engineer and fireman to accompany them to the

mail car, where the postal clerks were overpowered, and some mail sacks, with their contents, were taken. The railway company at once offered the reward mentioned, and, at the time the three men were arrested by the South Omaha police officers, no complaint had been filed in any court. The reward was offered "for the apprehension of the persons who, on or about the 22d day of May, 1909, in the nighttime, held up and robbed of a part of the United States mail being carried thereon, one of the trains of" the Union Pacific Railway Company, known as the Overland Limited.

The offer they made was for the arrest of those who had committed the offense of train robbery, a felony, as defined in section 13a of the Nebraska Criminal Code, and had also committed the offense of robbery of the mails, as defined in the statutes of the United States. Rev. St. U. S. §§ 5472, 5473 (U. S. Comp. St. 1901, p. 3694).

The nature of the arrest must be judged by the situation at that time, and not by the fact that subsequently the prisoners were yielded to the United States marshal and convicted under the statutes of the United States. The prisoners were arrested by officers acting under the authority of the state and were lodged in a jail under like authority, and the state could have retained the custody and caused the prosecution of the robbers. Whether or not the officers acted in pursuance of authority from the United States, they acted in pursuance of the laws of the state at the time of the arrest, and with the evident purpose of holding the prisoners for prosecution by either the state or the United States, as might thereafter be determined by the prosecuting officers. Under the law of the state, the policemen were authorized to make the arrests without a warrant, on reasonable suspicion that a felony had been committed and that the persons arrested had committed it. Diers v. Mallon, 46 Neb. 121–126, 64 N. W. 722, 50 Am. St. Rep. 598; Pritchett v. Sullivan, 182 Fed. 480, 104 C. C. A. 624.

By sections 283 and 284 of the Criminal Code of Nebraska, it is provided:

"Sec. 283. (Arrest by officer.) Every sheriff, deputy sheriff, constable, marshal, or deputy marshal, watchman, or police officer shall arrest and detain any person found violating any law of this state, or any legal ordinance of any city or incorporated village, until a legal warrant can be obtained.

"Sec. 284. (Arrest by private person.) Any person not an officer may, without warrant, arrest any person, if a petit larceny or a felony has been committed, and there has been reasonable ground to believe the person arrested guilty of such offense, and may detain him until a legal warrant can be obtained."

Section 64 of article 2, c. 13, Compiled Statutes of Nebraska 1909, which is the charter of South Omaha, contains this clause:

"And the chief of police and policemen shall have power, and it shall be their duty to arrest all offenders against the laws of the state or of the city, by day or by night, in the same manner as a sheriff or constable, and to keep them in the city prison or other place to prevent their escape until a trial or examination may be had before a proper officer, and they shall have the same power as sheriffs and constables in relation to all criminal matters and all process issued by the police judge."

Section 263 of the Criminal Code of Nebraska defines the duty of constables as follows:

"Sec. 263. (Constables.)  Constables shall be ministerial officers of the courts holden by justices of the peace in criminal cases, within their respective counties.  And it shall be their duty to apprehend and bring to justice felons and disturbers of the peace, and to suppress riots and to keep and preserve the peace within their respective counties.  They shall have power, and they are hereby authorized to execute all writs and process in criminal cases throughout the county in which they may reside and where they were elected or appointed."

It is apparent that these arrests were made under authority of their office, and that the law protected the policemen, as officers, in so acting.  It was contended that the arrests were made by the policemen, either as private citizens or in pursuance of official authority, but not in pursuance of official duty.  Neither contention can be accepted.  The arrests were such as these officers could make by virtue of their office, and were made in the city of South Omaha and in the apparent exercise of official authority, and it must be presumed that they were made by the officer as an officer and not as a private individual.  Somerset Bank v. Edmund, 76 Ohio St. 396, 81 N. E. 641, 11 L. R. A. (N. S.) 1170, 10 Ann. Cas. 726; Witty v. Southern Pac. Co. (C. C.) 76 Fed. 217–221; Ring v. Devlin, 68 Wis. 384, 32 N. W. 121.

Having authority to make arrests upon reasonable suspicion of felonies having been committed and of the guilt of the persons suspected necessarily implies that such authority shall be used in appropriate cases.  Officers may not refuse to use their good judgment in such cases until they are first given a reward by some interested party, or are commanded by a specific warrant.  If they may refuse or neglect to arrest one felon whom they have good cause to believe guilty they may refuse to act in all such cases.  It often occurs that shots are heard, and cries for help, or accusations of crime ring out, by day or night, indicating to all reasonable men that a serious offense has been committed, and men are seen running away under circumstances of suspicion.  Reliable information is often given to officers of the commission of a felony by some one designated, and delay often means the escape of the guilty person.  In all such cases, when the law has given the authority to the officer to act, it does not permit him arbitrarily to refuse to exercise it except on the spur of reward or warrant.  Because of his authority, the protection afforded to him as an officer, and of his official compensation, it is the duty of an officer to use diligence to exercise his authority to make arrests, when he has reasonable cause to believe a felony has been committed and that the guilty party may be apprehended.

In Lees v. Colgan, 120 Cal. 262, 52 Pac. 502, 40 L. R. A. 355, it is said:

"Was it the official duty of the petitioner to arrest the murderer?  There can be but one answer to this question.  Section 817 of the Penal Code of this state declares a police officer of a city to be a peace officer.  The arrest in this case was made without a warrant, but such fact in no degree changes the legal complexion of the merits of the litigation.  Section 836 of the Penal Code declares that a peace officer may make an arrest in obedience to a warrant delivered to him, or may without a warrant arrest a person: (1) For a public offense committed or attempted in his presence; (2) when a person arrested has committed a felony, although not in his presence; (3) when a felony has in fact been committed, and he has reasonable cause for believing the

person arrested to have committed it. In·other words, it is the duty of the peace officer to make arrests under any of the foregoing conditions. It certainly would be his duty to make an arrest where a public offense was committed in his presence. It likewise would surely be his duty to make an arrest where he held a valid warrant ordering the arrest. Yet, under the statute quoted, it is no more his duty to make arrests under such circumstances than it is when a felony has been committed, and he has reasonable cause for believing a certain person to have committed it. Here of necessity it must be assumed that petitioner had reasonable cause for making the arrest. It will not be assumed that he made it without good cause, and, if he had good cause for the arrest, it was his duty to make it. It cannot be contended for a moment but that a police officer would be grossly neglectful of his duty if the opportunity presented itself and he failed to arrest a person, having reasonable cause to believe such person to be a murderer."

This duty has often been declared. Schultz v. Greenwood Cemetery, 190 N. Y. 276, 83 N. E. 41. Warner v. Grace, 14 Minn. 487 (Gil. 364); Somerset Bank v. Edmund, 76 Ohio St. 396, 81 N. E. 641, 11 L. R. A. (N. S.) 1170, 10 Ann. Cas. 726; Witty v. Southern Pac. Co. (C. C.) 76 Fed. 217–221; Mason v. Manning, 150 Ky. 805, 150 S. W. 1020, 43 L. R. A. (N. S.) 131; State v. Jones, 91 Ark. 5, 120 S. W. 154, 18 Ann. Cas. 293; McNeil v. Board of Supervisors, 114 App. Div. 761, 100 N. Y. Supp. 239. In re Russell, 51 Conn. 577, 50 Am. Rep. 55.

The evidence, more fully stated hereafter, shows that these officers had reliable information that a felony had been committed, and that there was reasonable cause for them to believe, from the incriminating circumstances, that those arrested were the guilty parties. It is admitted that the officers who actually took the men into custody were on duty at the time, and that a telephone call had been sent in from the neighborhood where some revolvers, masks, a flashlight, and clothing had been found, stating that suspicious persons were lingering about, and in response thereto the officers went to the place designated, which was in the limits of South Omaha, and there they awaited near the hiding place where the revolvers had been hidden, evidently for those who had placed the articles there and whose return was expected. It is not claimed that they sought the arrest for any other charge, and each of the arresting officers says that he had the reward in mind at the time he went to the scene of the arrest and when it was made. As the reward was for the arrest of the train robbers, it must have been in the minds of the officers that the men to be arrested were probably guilty of that crime. The result is that the police officers of South Omaha must be held to have been acting in the line of their duty and on grounds of public policy are not entitled to any part of the reward. Section 157, Criminal Code of Nebraska; 24 Am. & Eng. Encyc. (2d Ed.) 952; United States v. Matthews, 173 U. S. 381–384, 19 Sup. Ct. 413, 43 L. Ed. 738.

[4] It follows that the money offered as a reward for the apprehension of Woods, Torgenson, and Grigware, which has been paid into court, must either be returned to the Union Pacific Railway Company or be given to some of the other interpleaded claimants therefor. The reward cannot be ordered returned to the complainant, for its bill of interpleader admitted title in some of the defendants, and its indiffer-

ence between them, and the decree placed it outside of the present controversy. Killian v. Ebbinghaus, 110 U. S. 568–571, 4 Sup. Ct. 232, 28 L. Ed. 246; 4 Pom. Eq. Jur. § 1325.

As in the case of any other contract, one who offers a reward may waive substantial conditions of the offer and accept such performance as is satisfactory to him. By its bill and the payment of the money into court, the complainant admits that some one of the defendants, who is legally qualified to accept, has apprehended the robbers. Kinn v. First Nat. Bank, 118 Wis. 537, 95 N. W. 969, 99 Am. St. Rep. 1012.

[5] Under the decision of McClaughry v. King, supra, the reward for the arrest of Woods, Torgenson, and Grigware, should go, if possible, to those who assumed the personal danger and responsibility of either actually arresting them, if any of the qualified claimants performed such acts, or, if none either actually arrested or caused the arrest, to such as most effectually and proximately aided in causing the arrest which was actually accomplished. The robbers, after leaving the train, carried the mail sacks that they stole, to a public school building in South Omaha, where they hid them in the attic. In a few days some school children discovered, buried in a ravine near the school building, some new revolvers of late pattern, cartridges, a flashlight, masks, hats, and overalls, which the robbers had buried there soon after the crime. They were turned over to the school authorities and by them to the police of South Omaha. The newspapers of Omaha had given publicity to the facts of the robbery, and the finding of these articles became generally known to the people in the neighborhood of the school. That afternoon the chief of police, with another officer of South Omaha, went to the place where the articles had been found and made inquiries of a number of young men whose ages ran from about 14 to 18 years, living adjacent to the place, and asked them to keep watch over the place and to report if any strangers appeared. It was not a populous part of the city, and strangers were easily detected. Six boys, James Belek, John Belek, Frank Krudna, John Krudna, John Krowlik, and Rudolph Morowisky, who had heard of the robbery and knew of the discovery of the suspicious articles, banded themselves together to keep watch and discover if any persons came about the hiding place where these articles had been found. They secreted themselves about 6 o'clock in the evening in a yard overlooking the place and kept up their vigils until about 10 o'clock at night, when they were rewarded by seeing four men approach, and one of them, who later proved to be Woods, went into the ravine and engaged in digging at the place where the articles had been buried. One of the boys, Rudolph Morowisky, was dispatched to a telephone at a saloon several blocks distant where he arrived so exhausted from his haste that the saloon keeper had to send his message for him to the police station, summoning immediate help. Two officers soon arrived in response to the call and accompanied Morowisky to the vicinity where the men had been seen. The other boys had drawn closer and were keeping watch from a point 15 or 20 feet away, and, as Woods started to leave the ravine, they followed behind him at a distance of about 60 feet. Morowisky and a police officer were approaching Woods

from one direction and the other five boys following Woods soon came up closely behind him. The policeman ordered Woods to hold up his hands, and the boys came up to the place of the arrest. Some inquiries were made of Woods as to his business there, to which he gave evasive answers. ·He was searched for weapons, but none were found. One of the officers was searching the ravine, and the officer in charge of Woods requested the boys to hold Woods for a few minutes while he made· a further search. While he was gone, Woods endeavored to curry favor with the boys guarding him by insisting that they knew him and that he would "fix it" or "square it" with them the next time he saw them, but the boys refused to acknowledge prior acquaintance with him. The officer soon returned, and, another one having arrived, one was dispatched with Woods to the police station, while the two other officers continued their search of the ravine and adjacent places. The boys kept with the officers and claim that they soon apprised them of the returning approach of two of the other suspected robbers. As they approached, the two officers with drawn weapons placed them under arrest. The boys were at the immediate scene of the arrest and closed in on the robbers at the same time that the policemen commanded them to surrender. The officers then took the men last arrested, who proved to be Torgenson and Grigware, to the police station, and these boys renewed their watch and claim to have seen a fourth man escape down the bank and run away later in the night. The acts of these six boys bring them within the class, described in McClaughry v. King, of those who assumed the personal danger and responsibility of causing their arrests. In case of resistance, or of desire to escape by these desperadoes, each was exposed to hazard of his personal safety. They had laid the trap for the bandits and kept surveillance over them when they had been found and had sent the word, which caused the police to arrive and make the arrests, and, in fact, were the effective cause of the arrests, and the policemen may be said to have acted for them in making the arrests at the time they were made, as is made clear by the line of decisions distinguished and not disapproved by the court in the decision of McClaughry v. King, supra. On that ground, as well as on the ground that these police officers may not receive the reward offered in this case, the amount· offered for the apprehension of these three robbers must be awarded to the six boys named, in equal portions. While others had given information that in some degree led to these arrests, the apprehension itself was not made by them, and the reward was not for information which would lead some one to make an apprehension, but to those who performed the act of apprehension.

[6, 7] One of the robbers was arrested, without a warrant, in Buhl, Idaho, by Willie E. May, who was at that time town marshal of the village, and a special deputy sheriff. His appointment had been made in writing, but he received no pay as such special deputy. It is urged that he had no duty to arrest a fugitive felon, under the circumstances, without a warrant, because the statutes of Idaho providing for the arrest and removal in extradition proceedings (sections 8416–8418, Idaho Revised Codes 1908) require that a written complaint be first

filed in the state to which the person charged is to be removed, and that then a warrant must issue in the state where the fugitive is and the arrest can be made only under such warrant. In Ex parte White, 49 Cal. 433, under similar statutes it was decided that one could not be held for removal unless he had first been so charged by a complaint in the demanding state. The authority to hold one in proceedings instituted under such statutes, the culmination of which means the removal of the person to another state, is quite distinct from the authority to make a preliminary arrest, until a proper complaint can be made, and a warrant obtained. See Virginia v. Paul, 148 U. S. 119, 13 Sup. Ct. 536, 37 L. Ed. 386. The authority to hold a prisoner for a reasonable time for such proceedings to be instituted has been many times affirmed. See 2 Moore on Extradition, §§ 591–595. The power of the proper peace officer to make arrest, without a warrant, of a fugitive from justice, provided he has reasonable cause to believe he has committed a felony has also been declared. State v. Taylor, 70 Vt. 1, 39 Atl. 447, 42 L. R. A. 673, 67 Am. St. Rep. 648; State v. Anderson, 1 Hill (S. C.) 327; In re Henry, 29 How. Prac. (N. Y.) 185; Cochran v. Toher, 14 Minn. 385 (Gil. 293); Simmons v. Vandyke, 138 Ind. 380, 37 N. E. 973, 26 L. R. A. 33, 46 Am. St. Rep. 411.

If this power does not exist, then one who has committed a felony may make his escape across the narrow boundary that may exist between two states, and be free from arrest by officers who may know of his guilt and may even have seen his offense committed, because no complaint in writing has been filed in the state where the crime occurred, nor has another complaint been filed in the state to which the criminal has fled, nor has a warrant been issued there. Such preposterous delay would often result in successful escape.

[8] There is no testimony to show the nature of the special deputyship conferred on May by the sheriff of his county. See article 18, § 6, Constitution of Idaho; section 2119, Idaho Revised Codes 1908; Lansdon v. Washington County, 16 Idaho, 618, 102 Pac. 344. He may have been deputized for some particular cases or otherwise limited in his powers, and, in the absence of all evidence as to his authority, it cannot be said that his duties included the arrest of Matthews. As town marshal he was a peace officer (section 7522, Idaho Revised Codes 1908), and therefore could make an arrest (2) when a person had committed a felony, although not in his presence, (3) when a felony has in fact been committed and he has reasonable cause for believing the person arrested to have committed it, (4) on a charge made, upon reasonable cause, of the commission of a felony by the party arrested. Section 7540, Idaho Revised Codes 1908.

May's duty, however, must be judged by the knowledge he possessed at the time he made the arrest. There is no evidence in the record that shows that he knew, or had any reasonable cause to believe, Matthews guilty of a felony. The only testimony on the subject is, from one who accompanied him when he made the arrest, that May stated he was about to arrest "a train robber." There is no evidence as to when or from what source May received any information, nor of its character or extent. In the absence of any testimony showing the nature of

the information possessed by May, it was not shown to be a part of his duty to make the arrest nor was he precluded from earning the reward.

[9] Shelton, another of the robbers, was arrested in Denver, Colo., by two policemen of that city. The duty and power of these particular officers to make this arrest is found in section 41 of chapter 147 of the Revised Statutes of Colorado 1908 (section 7278, Mills' Ann. Stat. 1912), which reads as follows:

"The duty of the chief and other officers of the police, and of the watchmen shall be under the direction of the mayor, and in conformity with the ordinance of the city, to suppress all riots, disturbances and breaches of the peace, to pursue and arrest any person fleeing from justice in any part of the state; to apprehend any and all persons in the act of committing any offense against the laws of the state or ordinances of the city and to forthwith bring such person or persons before the police court or other competent authority for examination, and at all times to diligently and faithfully enforce all such laws, ordinances and regulations for the preservation of good order and public welfare as the city council may ordain, and for such purpose they shall have all the power of constables. The mayor, chief of police and watchmen of the city may, upon view, arrest any person who may be guilty of a breach of the ordinances of the city, or of any crime against the laws of the state, and may, upon reasonable information supported by affidavits, procure process for the arrest of any person who may be charged with a breach of any ordinances of the city." Rev. St. 1908, § 6553.

This authority to arrest a fugitive from justice is evidently confined to the arrest of one who has committed a crime within that state, for by section 36 of the same chapter (section 7272, Mills' Ann. Stat.) it is provided with reference to the chief of police:

"He shall have power to pursue and arrest any person fleeing from justice in any part of the state, and to receive and execute any proper authority for the arrest or detention of criminals fleeing or escaping from other places or states."

This is a limitation of authority to the chief of police for the arrest of a fugitive from another state, and his authority is limited to the execution of a warrant for such arrest. As there does not appear to have been any duty imposed by law upon the two police officers who made the arrest of Shelton, they are entitled to receive the amount offered for that service.

The fee for the stenographer's service in taking testimony will be allowed in the sum of $40, to be taxed as costs, and a decree may be prepared finding that John Belek, James Belek, Frank Krudna, John Krudna, Rudolph Morowisky, and John Krowlik are each entitled to one-tenth of the amount paid into court, that Peter J. Carr and Coleman Bell are entitled jointly to one-fifth, and Homer A. Searle, as administrator of the estate of Willie E. May, to one-fifth, and that the bill of each of the other defendants be dismissed, and that each party pay his own costs.