Martin MANLEY et al.

v.

Joseph A. NICODEMISEN et al.

No. 56–57–A.

United States District Court
D. Massachusetts.

Jan. 3, 1957.

Edward J. Harrington, Jr., New Bedford, Mass., for plaintiff and intervener Hoyle.

Bingham, Dana & Gould, Seymour P. Edgerton, Boston, Mass., for Joseph A. Nicodemisen et al.

ALDRICH, District Judge.

This is a libel in personam for salvage brought against the owners of the Elizabeth N. On January 26, 1955, at 11 A.M., the Elizabeth N., while dragging for scallops offshore on Georges Bank, was rammed by the fishing vessel Dartmouth. She was holed on the port side, aft, in the forward part of the engineroom. The damage was above the waterline, but she took water because of her roll. The weather was fine, and the wind and sea moderate. The captain was asleep below, off the engineroom, and on being wakened, found her apparently making water fast. The break was behind the fuel tanks where it could not be reached. The tanks had been damaged and the combination of water and diesel soon reached half-way up the engine and flooded her. Before it stopped the crew succeeded in shipping both dredges, and, at the captain's orders, in launching one of the dories. Meanwhile, the Sea Ranger, another vessel fishing in the vicinity, had been reached by radio telephone, and was standing by close aboard. This was all accomplished in a matter of a quarter of an hour. The captain then concluded that with five feet of water already in the engineroom the rest of the vessel would soon fill and she would sink. The crew shared his opinion, and a good deal of excitement prevailed. One member jumped into a life raft, but was brought back. At this point the captain decided that for safety's sake it would be wiser to proceed forthwith to transfer the crew to the Sea Ranger, without awaiting further developments. One of the libellants testified he would have gone even if the captain had not said to. I find this was the general view. Respondents make some point of what exact orders were given. This was not a formal boat drill. I find the captain merely said to take the dory and leave. Where to leave to was obvious.

The transfer required three trips, the captain going on the last. After they were aboard the Sea Ranger a member of that crew borrowed the dory and went to a third vessel, which had a man who needed to get ashore, it being understood that the Sea Ranger, whose trip was about finished, would go home. This later operation took over an hour, although the eleven men from the Elizabeth N. had transferred in less than half that time. Only one man was handling the dory, and I find that he was not hurried because the Sea Ranger intentionally remained to watch the Elizabeth.

When the men left the Elizabeth N. her stern was nearly awash. Thereafter it was observed that instead of settling further with any rapidity, she progressed very little. The captain held a conference with some of the men and it was decided that he would go back aboard,

and if it looked possible to save her some of them would come and help. On his return he found the engineroom not much deeper than before. He also discovered that much of the flooding was diesel from the tanks, which in the excitement previous had created the illusion of more water coming in than was the fact. He then raised a fishhold hatch and discovered that the watertight bulkhead was keeping the vessel dry forward of the engineroom. He accordingly signaled the men, and three of them joined him. As a result of strenuous work they got matters sufficiently under control so that first the Sea Ranger, and later the Coast Guard, was able to tow her back to port. The captain and these three men now claim salvage.

I find that without such services, performed either by libellants or someone else, the vessel could not have been saved. Respondents do not question the meritoriousness of the services, but say that libellants, by virtue of their relationship to the vessel, are not entitled to make claim. I will deal first with the captain.

■ The relationship of a master to a ship is a peculiarly close one. His duty has been described as fiduciary. It includes doing, at all times, everything possible to preserve the vessel. The so-called duty of a captain to go down with his ship exists more in fiction than in fact, but there can be no doubt that he must risk even that, in some measure, if by remaining aboard he may be able to save her. A master should not be allowed to claim salvage for doing his duty. Cf. Spivak v. United States, 3 Cir., 203 F.2d 881; Firemen's Charitable Ass'n v. Ross, 5 Cir., 60 F. 456 (municipal firemen cannot claim salvage); Union Pacific R. Co. v. Belek, D.C.D.Neb., 211 F. 699; Williston, Contracts, § 132 (policemen cannot claim rewards offered for apprehension of criminals).

■ Furthermore, it cannot be suggested that work of any kind performed by a captain and crew before they had abandoned ship could be regarded as salvage. Salvage is a special payment for persons who are strangers to the vessel. The John Perkins, C.C.D.Mass., 13 Fed. Cas. page 702, No. 7,360. It is the master who gives the order to abandon. It would be establishing a very poor principle to hold that a master could, by giving such order, terminate his own duty towards the vessel and put himself in the position of a stranger able to make a substantial extra claim against the owners. The Nebraska, 7 Cir., 75 F. 598.

■ Particularly I would not want to recognize any such principle on the facts of this case. While it was probably appropriate to order the men over to the Sea Ranger when he did, as a precautionary measure, I cannot help wondering why, at least while the earlier boatloads were going over, the captain did not look in the fishhold to check on the bulkhead. He testified that "it hadn't dawned on me that was a watertight bulkhead—there aren't many in the fleet." This last observation was somewhat contradicted by another witness. At any rate it seems unthinkable that a man could be captain of an 85 foot vessel for several trips without knowing she had watertight bulkheads. I think it did not dawn on him at that particular moment because he had just been asleep and awoke to face an unusual and difficult situation. Later he thought of it. Had he thought of it before, the men might never have had to leave the ship.[1] It would be most inappropriate to award a master salvage based upon an initial decision which, though understandable, fell short of the highest degree of care.

■ The question as to the other libellants is a somewhat narrower one, but

---

[1]. Note, particularly, the captain's testimony that after observing five feet of water in the engineroom he figured if he waited until there was five feet in the whole boat they would be lucky to get the dories down. Had he realized the water was not getting into the rest of her, it would have presented a different picture. Also, he might then have appreciated that over 200 cubic feet of fuel oil, being all confined aft, accounted for a large percentage of the flooding.

not dissimilar. Here the question is whether libellants by virtue of what had occurred had ceased to be members of the crew and had become strangers to the vessel. It is clear that no specific orders were given discharging them as crew members, and the inquiry becomes whether, under all of the circumstances, they had been impliedly discharged. It is sometimes said in this situation that the test is whether the vessel had been abandoned without any hope of return. Bertel v. Panama Transport Co., 2 Cir., 202 F.2d 247, certiorari denied 346 U.S. 834, 74 S.Ct. 35, 98 L.Ed. 356; Drevas v. United States, D.C.D.Md., 58 F.Supp. 1008. It is difficult to say on the facts of the present case that there was no possible hope of return. The burden of proof on this issue is upon the libellants. It is true that each testified he believed, at the time, that the ship would go down, but I do not think this is determinative. This is not a case where the crew went away, and only happened again upon the vessel by chance, as in The Georgiana, 1 Cir., 245 F. 321. Here they never left the immediate vicinity. Cf. Drevas v. United States, supra. I cannot believe that everyone was ignorant of the watertight bulkhead, or of the fact that much of the content of the engineroom was diesel. I doubt whether the sole reason for their remaining about was the fortuitous one that a man was to be picked up from another vessel.

■■ Moreover, I do not believe that lack of hope at the moment of abandonment should be the sole test. Weight should be given to the circumstances under which the men left, namely the aforementioned excitement, and their determination to leave whether ordered to or not. It is not necessary to criticize the men for what may have been a quite natural reaction. But having made a speedy decision in their own interests, they owed the vessel a duty to stay around and make sure it was a wise one in hers. The ship was entitled to sober second thought. Although their relationship was not as close as the captain's, they had a duty to save her, which lasted until their ability to render ordinary emergency service was clearly over. I find it was not.

■ The return to the vessel and the work done by these libellants was in the highest tradition of the sea. I do not think it would be appropriate, however, to hold that it was done by strangers to the vessel, and that libellants should be treated as salvors. This decision is not affected by the fact that they worked on a lay, as distinguished from straight wages. Regardless of their method of compensation, they were members of a vessel which had been struck, and they must share in the bad as well as the good. See The Georgiana, 1 Cir., 245 F. 321.

The libel is dismissed.