### THE GEORGIANA.

#### ATLANTIC MARITIME CO. v. TYSELL et al.

(Circuit Court of Appeals, First Circuit. July 27, 1917.)

No. 1271.

1. SALVAGE ⬅8—RIGHT TO COMPENSATION—NATURE OF SERVICE.

Members of a crew of a vessel, which had grounded and whose entire crew had left her, while trying to return to the schooner to take a fresh departure for the shore, found that she had floated off and was beating about by herself, not over a mile from a dangerous and little frequented

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

shore. They boarded her, found her down by the head, and her rudder damaged or displaced, but hoisted her jib, and found that she could be got to make headway on a course which finally grounded her on a beach, where she was in no danger. *Held*, that these services were salvage services, entitled to be compensated as such, unless their connection with the vessel or her voyage precluded them from acquiring rights as salvors.

2. SEAMEN ⚖═28—SHARE IN EARNINGS—LIEN.

Where a fishing trip is undertaken on what is known as the quarter lay plan, whereby the owners have one-quarter of the net proceeds, and the other three-quarters are shared by the master and men in various proportions, bait, ice, and provisions being first paid for, the members of the crew have a lien upon the vessel and the catch on board, corresponding to the lien of seamen shipped for hire in the ordinary way.

3. SALVAGE ⚖═18—RIGHT TO COMPENSATION—MEMBERS OF CREW.

Members of a fishing crew shipping on the quarter lay plan, while they remain bound by their engagement, are regarded as under contract to do all within their power, whatever the emergency, for the safety of the vessel and the catch, and as incapable, like seamen serving for wages, of becoming salvors, but as soon as they are discharged from their agreed service, formally or expressly, or by implication from the circumstances, and have been released from any obligation to exert themselves for the benefit of the vessel or property on board her, their previous connection with the vessel does not prevent them from becoming salvors in respect of any such exertions.

4. SALVAGE ⚖═48—RIGHT TO COMPENSATION—EVIDENCE.

In a suit for compensation for services rendered by members of a crew, who returned to their vessel and brought it to a place of safety after it had been deserted by the master and crew, evidence *held* to support the District Court's finding that the vessel and the voyage were abandoned when all hands left the schooner, though there was some evidence that the master intended to return, and though he gave some orders to the members of the crew after leaving the schooner.

5. SALVAGE ⚖═29—AMOUNT.

Where members of a crew of a schooner, which had grounded and been deserted, found that she had floated off and was then within a mile of a dangerous and little frequented coast, and at considerable danger to themselves boarded her and brought her aground on a beach, where she lay in safety, and worth $2,500 in her damaged condition, a salvage award of $200 to each of the two libelants would not be reduced, though the amount of the labor or skill involved was not considerable.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Libel by John W. Tysell and others against the schooner Georgiana; the Atlantic Maritime Company, claimant. From a decree for the libelants, the claimant appeals. Affirmed.

George L. Dillaway, of Boston, Mass., for appellant.
Howard W. Brown, of Boston, Mass., for appellees.

Before DODGE and BINGHAM, Circuit Judges, and BROWN, District Judge.

DODGE, Circuit Judge. Appealing from a salvage award of $200 to each of the two libelants here appellees, the owners of this schooner contend that the services for which the award is made were rendered while said libelants were members of her crew, and therefore incapable of acquiring rights as salvors against her.

⚖═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The schooner was a fishing vessel, on a fishing voyage at the time. Her crew numbered 22 including the two libelants. About two weeks after leaving Gloucester, during which time she had taken 50,000 or 60,000 pounds in all of cod and haddock then on board, she ran aground on the southerly end of Black Ledge, distant about 3 miles from Isaacs' Harbor, which is some 70 miles east of Halifax, on the Atlantic coast of Nova Scotia. Her entire crew left her in dories for the shore soon afterward. This they did at about 2:30 a. m., on Thursday, December 30, 1915, leaving the schooner apparently fast aground, rolling and pounding on rock bottom, and already leaking badly. That it was unsafe for them to stay longer aboard her where she was is undisputed; it was snowing, and the wind, from about E. N. E., was blowing at the rate of 20 or 25 miles an hour.

When all hands left her as above, the master had told the crew "it was all off," and had recommended them to take with them in the dories such of their clothes and personal effects as they could get together without losing much time. He directed the dories to keep together after leaving the vessel, in order that he, being acquainted with the locality, might pilot them to a safe landing place. He has testified that he intended next morning to try and save all the property, if possible and if there was a chance to do it. He tried, after getting ashore, to find a motorboat which he could use, and which would have been necessary in any such attempt, but was unable to procure one. That he told all the crew, before they left her, what his intentions were as to any further attempt at saving the vessel, does not appear; but there is evidence that he told some of them, who were in the same dory with him, while rowing ashore. Whether there could have been any chance of saving her, or anything from her, had she remained on the ledge where she grounded, depended altogether on the wind and weather. Had the wind increased, or changed so as to blow more from the eastward, it may be assumed that there would have been no chance at all.

The two libelants and another of the crew (who has disclaimed any right to salvage) left the schooner as the only occupants of the same dory. They lost sight of the other dories, and later found themselves heading toward breakers not very far from Black Ledge, became uncertain as to the proper course toward the landing for which the other dories were heading, and turned back to find the schooner again, in order to take a fresh departure from her. While rowing toward her supposed position, they sighted a red light, which proved to be her port light, and they then found that she had floated off the place where she had been left aground and was beating about by herself between Black Ledge and the shore. They boarded her, found her down by the head, with the water over her forecastle and cabin floor, so that nothing could be accomplished by such pumping as they could do, but nevertheless capable of staying afloat for a while longer. She had been left with her jib triced up, her forestaysail, foresail, and mainsail set, the main sheet being slacked off. Attempts to steer her showed that her rudder had been so damaged or displaced that she would not answer her helm. She was coming up to and falling off again from

the wind. Directly to leeward there was, as the chart shows, a dangerous shore not over a mile distant.

They thereupon lowered, cut loose, and hoisted the schooner's jib; and found, after it was set, that she could be got to make headway on a course which ultimately took her to a point at the head of Fisherman Harbor, some 2 miles or more distant from the place where they had found her, and nearly 3 miles in a direct line from where she had been aground on Black Ledge. They kept sounding, with tackle which they improvised, as she progressed. She ran aground, at the point where she reached the shore, on a beach; and was thereafter in no danger either of sinking in deep water or of drifting ashore upon rocks. They then took down her sails, having to cut the halyards in order to get the mainsail down, and waited for daylight. Soon after daylight the master who had landed considerably earlier, with the remainder of the crew, not far away, came aboard and asked the three men to watch her while he went to the nearest telegraph office, some 4 miles distant. They stayed aboard her during the day, but not. during the following night. Other members of the crew visited the vessel while she lay there, and removed what they could find aboard her belonging to them. She was later removed and taken ultimately to Gloucester, with the aid of a wrecking steamer sent for by the master. In this, however, the crew did not take any part; they left for their homes on Sunday, January 2d; the wrecking steamer having arrived before they left.

[1] The above services would, without doubt, have been salvage services, entitled to be compensated as such, if rendered by persons in no way connected with the vessel or her voyage. The schooner, afloat, deserted, and sinking, off a little frequented and dangerous coast, as these men found her, was clearly in imminent danger of total loss. To board her and stay aboard her, as they did, in such weather, unable to direct her movements, except to a limited degree, and uncertain how long she would be able to keep afloat, involved real danger to them, even if it be conceded that statements in the opinion below, that they had lost their dory when they boarded the schooner and that no other small boats appear to have been left on board her, are not sufficiently supported by the evidence. That her owners were enabled to get her back to Gloucester in a reparable condition may fairly be said to be due to their exertions from the time they discovered her afloat until she was beached at Fisherman Harbor. Not only is this conclusion fully supported by the evidence, but on January 2d, in a communication to the insurers of three-eighths of the vessel owned by him, the master stated in writing his opinion that the three men were "entitled to some recompense for their part in putting the vessel where she can be saved; otherwise she would be a total loss."

The alleged salvors had not been serving on the schooner for wages. The fishing trip for which they shipped had been undertaken upon what is known as the "quarter lay" plan; i. e., the owners were to have for the use of their vessel one-quarter of the net proceeds of the catch, a part of said quarter being due from them to the master; the other three-quarters were to be shared by the master and the men engaged, in

various proportions, bait, ice, and provisions for the voyage being first paid for therefrom.

[2] For the value of their respective shares in the catch taken, upon a trip made upon terms like the above, the members of a fishing crew have a lien upon the vessel and the catch on board, corresponding to the lien of seamen shipped for hire in the ordinary way, for their unpaid wages against vessel, cargo and freight pending, so long as anything remains of either. See The Carrier Dove, 97 Fed. 111, 38 C. C. A. 73, decided by this court in 1899.

[3] While the members of such a crew remain bound by their engagement for the trip, they are to be regarded as under contract to do all that it may be within their power to do, whatever the emergency, for the safety of the vessel and catch, and as incapable, like seamen serving for wages, of becoming salvors as to the same.

But as soon as the members of such a crew are discharged from their agreed service, whether formally or expressly, or by implication from the circumstances, and have been thus released from any obligation to exert themselves for the benefit of the vessel, or property on board her, their previous connection with the vessel does not prevent their becoming salvors in respect of any such exertions. The District Court has found that this vessel was finally abandoned when her master and crew left her aground on Black Ledge, and that the men on board were thereafter released from further obligation to her; a finding which her owners assert to have been unjustified by the evidence, and therefore erroneous.

[4] As has been stated, the master told the men "it was all off" at the time they took to the dories. There is no evidence that he ever formally or expressly discharged them, except that one of the two libelants testified that he told them next day, at Fisherman Harbor "they were all clear." There were no wages due them; and as to their shares in the catch, it would in any case have had to arrive where it could be sold before their claims to a share could have amounted to anything; and there is no proof that such claims were ever of any value. The fish on board was not proceeded against in this case, nor its proceeds in the owners' hands, and what became of it, or any proceeds therefrom does not appear; but the evidence tends to show that, after the vessel had filled, it would not be worth enough, in any event, to cover the expenses chargeable to the crew for the trip. As to the master's intention of returning next day to the vessel on the ledge, we can hardly regard it as of any significance after the vessel had come off that ledge and become exposed to the very different and more immediate danger of sinking before daylight, thus changing altogether the situation to which the alleged intention related. After telling them that "they were all clear," instead of keeping them together for any further continuance of the trip with the schooner, beached as she then was and the wrecking steamer expected, we do not think he can claim to have held them until that moment bound to the vessel's service, in view of his statement to them the night before when they were leaving the vessel, that "it was all off." It does not appear that the schooner afforded either of the men on board her or

any of the crew food or shelter while they remained at Fisherman Harbor. It is said that during her stay there they obeyed the master's orders until after he had told them "they were all clear." While some suggestions or requests made by him appear to have been followed, it is not clear from the evidence that these were either given or understood as orders to a crew in the vessel's service. Upon the evidence we cannot hold the District Court's finding that vessel and voyage were abandoned when all hands left the schooner on Black Ledge to have been erroneous.

[5] The schooner is valued for the purposes of this case at $2,500, which must necessarily mean that she had that value as she lay on the beach in her damaged state, as above. Although the time occupied by the libelants' services was short and the amount of labor or skill involved not considerable, the value to the vessel of the result accomplished was so important as to prevent us from reducing the amount awarded on the ground that it is excessive.

The decree of the District Court is therefore affirmed, and the appellees recover their costs of appeal.