O’NIELL, J.
The original plaintiff in this suit, H. T. Cottam & Co., Inc., is_a Louisiana corporation, domiciled in New Orleans. The defendant, Comisión rieguiadora, is a.Maxican corporation,' domiciled in the state of Yucatan. The suit is to recover a large sum of money -represented by written- evidences of debt. The defendant being domiciled outside of the state of Louisiana, a writ of attachment was obtained, by virtue of which the sheriff seized, as the property of the defendant, the steamship Oaxáca, in port at New Orleans. 1
The Republic of Mexico filed a petition of intervention in' the suit, averring that the ship had been seized or embargoed by the^ Mexican government, for a large debt due the government by the Comisión Reguladora, and that she was in the actual possession of the Mexican government when the sheriff seized her under the writ of attachment. The intervener - therefore prayed that the writ of attachment should be dissolved, and that intervener should be recognized as having the exclusive right, as a foreign sovereign state, to marshal and administer 'the assets of the defendant, Comisión Reguladora, by virtue of the alleged embargo or seizure by which intervener had taken possession of and was actually administering the property of the Comisión Reguladora. Tlie defendant, having filed several exceptions, which were overruled or referred to the merits, answered-the suit, putting at issue the allegations of the original petition. The suit was tried on its merits, and judgment was rendered in favor of the original plaintiff for $126,487.34, allowing legal interest from the 30th of April, 1919, and maintaining the attachment and the resulting lien in favor of plaintiff. The petition of intervention was dismissed and intervener’s demand rejected. As tlie intervener alone has appealed, the contest is now confined to the issues tendered by.the intervention, between the intervener and the’ original plaintiff.
It is not disputed that the attachment of the Oaxaca, obtained by plaintiff, was valid, unless its validity was prevented by the action taken previously by the Mexican government against the Comisión Reguladora. That action was taken in Yucatan, Mexico, four *1029 months and sixteen days before the attachment was levied on the Oaxaca at New Orleans. The facts concerning the so-called embargo, levied by the- Mexican government, are free from dispute. ✓'The government undertook to seize all os. the property of the Comisión Reguladora, for a debt of $8,S39,-500, equal to 7,679,000 pesos in paper money, owed by the Comisión Reguladora to the Republic of Mexico. The Oaxaca was then in port at New Orleans where she has remained ever since. Three months after the levy of the embargo in Yucatan, the Oaxaca was seized in the port of New Orleans, under an admiralty warrant issued by 'the United States District Gourt-herer-in a suit wherein another local creditor-hajLFled a libel against the ship, for material and labor furnished, amounting to nearly $6,000. One month and eighteen days later, the ship was released from the seizure under the admiralty warrant, on a bond furnished by the defendant, Comisión Reguladora, with the American Surety Company of New York as surety. It was then that the sheriff immediately attached the ship, at the instance of the plaintiff in this suit.
The Republic of Mexico has never taken actual possession of the Oaxaca, and, as far as the record shows, did not attempt to take actual possession of her, or assert a claim on her in New Orleans, until the intervention was filed in this suit, nearly eight months after the embargo proceedings were had in Yucatan. The Mexican government did actually seize and take possession of what property the Comisión Reguladora had in Yucatan when the embargo was levied. It was an extrajudicial seizure, a proceeding similar to the extrajudicial seizure that is permitted in the United States by certain federal statutes, like the revenue laws, for example. What was done with regard to the ships and other property belonging to the Comisión Reguladora is explained in a trans-1 lation of an excerpt from a contemporaneous record made of the proceedings, thus :■
“In the state of Merida, September 18, 19Í0, at 30 min. past 9 a. m. I, the executor, aecom'-' panied by. my witnesses and by Julio Sierra Ugarte, the named interventor, we proceeded to the place occupied by the Department of the S. E. Navigation Line in order to make an inventory of the vessels which had been embargoed and all of the .things belonging to that line which were in that office. There was present at this act, Dr. Roberto Casellas Diaz, the Acting. General Mgr. of the Reguladora, and Arnulfo Peralta, director of the S. E. Navigation Co. I notified them of the object of this proceeding and began to inventory the things that I have already mentioned, in the manner following: The ships Mexico, Coahuila, Jalisco, Oaxaca, Temaulipas, Tobasco, Tenuantepee, Sofia, Marino, respectively,, for the following gross tonnage, 2,017 tons; 2,585 tons; 1,386 tons; 1,998 tons; 1,298'tons; 844 tons; 66 tons and 15 tons.
“Continuing our taking of the inventory by including the movables and appurtenances found in this office, in the manner following: One se.t of American furniture,” etc. [Sere is described a long list of articles, consisting mainly of office furniture and equipment, iron safes, typewriters, adding machines, etc.]
“We then made a formal delivery of all the articles heretofore described with the exception of the steamers, that is to say, all of the movables and appurtenances in the office of the interventor named Julio Sierra Ugarte, who recognized having received the same to bis satisfaction and declared that said furniture and appurtenances shall remain in the same office for the continuance of its service so that the work shall not be interrupted and the affairs shall run in the normal way. It is stated here, that the information relating to the ships and movables inventoried, bad been made in lots by the director of the Navigation Line, Arnulfo Peralta.”
The proceedings were had pursuant to a Mexican statute, referred to as the law of May 23, 1910, the pertinent sections or articles of which are translated as follows,, viz:
“Art. 30. In order to carry out an executive collection, the proper officer shall order a proceeding instituted in conformity with the laws on the subject, for the purpose of proving up the existence of the right of the fiscal, and to *1031 adjust and liquidate the indebtedness. When these proceedings have been terminated, a resolution shall be dictated, ordering that the debtor be notified, so that he may proceed to make payment within the period fixed in article 27, and setting forth that, if this is not done, proceedings shall be instituted against him through the economic eoactive power.”
“Art. 35. Should the payment not have been made within the legal period, the office shall appoint an executor and will issue an order of execution against the'. property sufficient to cover the indebtedness, the charges and the expenses of the execution.”
“Art. 40. The debtor shall designate, in the order expressed in this article, the property to be attached. Should he fail to do so, or the property pointed out not be sufficient in the judgment of the execution officer, then said officer shall designate the property in the following order: I money; II jewelry; III credits that can be realized at once; IV wages and salaries, inclusive of those of the federation in the proportion fixed by the following articles; V products or incomes of all kinds; VI movables; VII immovables; VIII credits or rights not collectible at once.”
“Art. 51. Should the attachment redound on movables, other than jewelry or credits, and which cannot bo kept in the office, the executing officer shall appoint a depositary, who shall keep the same under his responsibility and at the disposition of the respective office. If the property or assets attached are immovables a trustee shall be appointed, who by preference shall be the owner himself, without prejudice to the plaintiff office appointing a now trustee, when in its judgment there is sufficient reason to remove the trustee first appointed.”
We do not find in the statute any .provision for levying a constructive seizure upon a ship on the high seas or in a foreign port, or for levying a constructive seizure upon any property not actually in the .Republic of Mexico.
[1] Two Mexican lawyers testified that, according to the law of Mexico, the effect of such a constructive seizure, as was levied upon the Oaxaca in this instance, was to invest possession of the property in the Mexican government. It appears that both of the lawyers were expressing merely their interpretation of the law of May 23, 1910, without reference to any decision of a Mexican court, and without reference to any other-law of Mexico; and one of the two lawyers admitted that he did not know of any decision on the subject by a Mexican court. Therefore, unless we are to put upon the two Mexican lawyers a responsibility which belongs to this court, rve must read and interpret the statute of May 23, 3910, as we find it; and, as rve read it, there is no provision that gives to such a constructive seizure as ■was levied upon the Oaxaca the effect of investing actual possession of the property in the Mexican government.
[2] There is no reason why the constructive or fictitious seizure levied on the Oaxaca in Mexico, while the ship ivas in the port of Now Orleans, should have any more effect upon the rights of creditors in New Orleans, than if the constructive or fictitious seizure had been levied judicially, on a final judgment of a Mexican court. If such a seizure had resulted in a sale of the ship to a citizen of México', it WOüld, perhaps! have conveyed a valid title, under the law's of Mexico ; and, if the purchaser had taken actual possession of tlie~~sTiip~ within a reasonable time, or as soon as circumstances would have permitt£c?rtile~sale might have been held valid girainst the riglit^TLreaitors of the original owner of theTsEIp, in~Ñew• Orleans, where’the shin NmsTL. See Portland Bank v. Stacey & Mansfield, 4 Mass. 661, 3 Am. Dec. 253, cited with approval by this court in Thuret v. Jenkins, 7 Mart. (O. S.) 318, 12 Am. Dec. 508. See, also, Abbott on Shipping, pars. 28 and 30, pp. 35 and 37. But the Republic of Mexico did not take, or attempt to take, actual possession of the ship within a reasonable time, or, in fact, within the several mouths during which the circumstances permitted. Under those circumstances, there ivould bo no reason for our holding that, by virtue of her sovereignty, the Republic of *1033 Mexico acquired any greater advantage over the .creditors, in New Orleans, of the original owner of the ship, than a citizen of Mexico could have acquired if he had bought the ship by assignment and delivery of the bill of sale and other documents relating to her, all in Mexico, while the ship was 'at New Orleans. All the authorities on the subject seem to agree that, under such circumstances, the assignee of a ship at sea or in a foreign port must, in order to affect the rights of creditors of the assignor, take actual possession of the ship within a reasonable time, or as soon as circumstances will pcrinih,
[3] It has been decided by this court that a foreign ship in this state is subject to attachment at the instance of creditors of her owner, after he has transferred her at her home port by an assignment of the bill of sale, before the assignee has taken actual possession. See Olivier v. Townes, 2 Mart. (N. S.) 93, cited with approval in Gasquet & Co. v. Johnston, 2 La. 516, and in United States v. President, etc., 8 Rob. 262. In Olivier v. Townes, Porter, J., for the court, gave these appropriate expressions upon thg" conflict of laws, regárding a boat, viz.: /
“The municipal laws [meaning, of course, as Bouvier defines them, state and national laufe, in contradistinction from international lau\l .of a country have no force beyond its terriN torial limits, and when another government permits these to -beTarried into' effect within her jurisdiction, stro~does so unon a principle of conritjv In doing so care must be taken that no injury is inflicted on her own citizens, otherwise, justice would be sacrificed to cour-. tcsy, nor can the foreigner or stranger com-; plain of this. If he sends his property within a jurisdiction different from that where he re-, sides, he impliedly submits to the rules and-regulations in force in the country where he' places it. What the law protects it has a right to regulate.”
[4] Counsel for intervener contends that the plaintiff in this case cannot question, and the courts of this country cannot inquire into, the sufficiency or legal effect of (ho proceedings had on behalf of the Mexican government in that country. He relies upon the doctrine announced in Oetjen v. Central Leather Co., 246 U. S. 297, 38 Sup. Ct. 309, 62 L. Ed. 726, and repeated in Ricaud v. American Metal Co., 246 U. S. 304, 38 Sup. Ct. 312, 62 L. Ed. 733, viz.:
“Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit 'in judgment on the acts of the government of another, done within its own territory.”
The doctrine quoted is not approximate to the case before us, as it was to the cases cited'. We are not sitting in judgment on the acts of the Mexican government, done in that country, as far as they were done. If those acts had been followed to a proper conclusion, by a taking of possession of the ship within a reasonable time, or when the circumstances permitted, -while the ship was in the port of New Orleans, we would not sit in judgment on the validity of the liroceedings had in Yucatan. But the doctrine announced by the Supreme Court of the United States, in the cases cited, does not mean that the courts of one country must give to the acts of the government of another, done within its own territory, whatever extraterritorial effect the government of that other country may claim for such acts. In each of the cases cited, the property taken by the Mexican government, by extrajudicial proceedings, was personal property, in Mexico, and therefore subject exclusively to the jursidiction of the government of that country. The property was seized for military contributions, and was sold and delivered to the irurchasers, who, or whose transferees, afterwards brought the property into the United States. The .ruling was that the courts of this country should not sit in judgment on the acts of the military authorities who had seized and sold and delivered the property in Mexico. The main feature that distinguishes those cases from *1035 the case before us is that, in those cases, the foreign government had exclusive jurisdiction over the property until the title was conveyed by actual ■ delivery. In the case before us, it is true, the Mexican government had jurisdiction, to a certain extent, over the Oaxaca, because of her flag, although she was in a port of another country. But that jurisdiction was not exclusive. McCargo v. New Orleans Insurance Co., 10 Rob. 202, 43 Am. Dec. 180. As far as the local creditors of her owner were concerned, she was subject to the laws of the country in whose port she was, unless, as Justice Porter said in Olivier v. Townes, justice is to be sacrificed to courtesy. Our conclusion is that the judgment appealed from is correct.
The judgment is affirmed.