USATORRE et al. v. THE VICTORIA et al.

RODRIGUEZ et al. v. THE VICTORIA et al.

No. 120, Docket 21171.

(United States Court of Appeals
Second Circuit.

Jan. 27, 1949.

FRANK, Circuit Judge, dissenting in part.

The opinion of the district judge, relating to both of these consolidated suits, reads as follows [64 F.Supp., 370, 371]:

"These libels by some of the crew of the Victoria one for salvage and other for wages, were consolidated and tried together. This court has denied motions to dismiss the libels for lack of jurisdiction. Usatorre v. Compania Argentina Navegacion Mihanovich, D. C., 49 F.Supp. 275; The Victoria, D. C., 47 F.Supp. 341.

"The Victoria was an Argentine tank vessel, flying the Argentine flag, and owned by an Argentine corporation. Five of the crew were Spaniards, three Portuguese and the others Argentineans. They all signed articles at Buenos Aires in Argentina for a voyage to Edgewater, New Jersey, and return. At about 6:50 p.m. on April 17, 1942, when about 360 miles from New York and 300 miles off the coast, the Victoria was struck by a torpedo which tore a hole about 25 feet in width and 25 feet in height under the water line on her port side near the bow, opening up tanks 1 and 2. The captain ordered the life-boats to be made ready for use and ordered the chief officer and some members of the crew to board life-boat No. 1, which was launched and made fast to the Victoria by cable on her starboard side near the stern. At about 8 p.m. she was struck again by a second torpedo, which tore another hole about 25 feet wide and 25 feet high under her water line near her stern, opening up tanks No. 6 and 7. The captain thereupon ordered the ship to be abandoned and he and the 17 remaining members of the crew left in life-boat No. 2.

"Thereafter the life-boats drifted, were rowed or sailed away until they lost sight of the vessel and each other. Shortly after 2 a.m., April 18, 1942, the United States destroyer Owl sighted the Victoria. At about 8 a.m. she went alongside the drifting derelict and placed aboard eight men who got her under way for a short distance. At about 7 a.m., April 19, the Owl picked up life-boat No. 1, transferred the crew to the Victoria and returned the eight men to the Owl, leaving the Victoria in command of her chief officer. At about 11 a.m. the Victoria, escorted by the Owl, got under way for New York under her own power. At 6 p.m. April 19, the United States destroyer Nicholson picked up life-boat No. 2 and transferred her crew to the Victoria. At about 10 a.m. April 20, the Owl was relieved by the Navy tug Sagamore, which continued to escort the Victoria till 9:55 p.m. April 21, when port was reached.

"In the deposition taken on behalf of the respondent, the first officer of the Victoria stated that immediately after the first torpedo struck the captain ordered that the lifeboats be prepared for use; that, ordered to do so by the captain, he examined the damage; that he realized it was below the water line; that it was impossible to determine exactly the damage but it must have been great because there was fuel oil coming out of the double keel and also linseed; that after he had seen the damage he told the captain that he thought that if not struck by another torpedo the boat would not sink; that he said to the captain 'Let's launch two lifeboats but tie the boats to the ship by means of a cable to see what would happen'; that the captain did not take his suggestion but ordered him and some of the members of the crew to board life-boat No. 1 which was then launched and tied to the Victoria along the starboard side; that the second torpedo almost cut the ship in half; that the life-boats were launched in a very strong northwest wind and heavy sea.

"The evidence leaves no doubt that when the captain ordered the crew to take their clothes and to launch the life-boats in a strong wind and in a rough sea, he was acting in the best of faith and that he and the crew feared and believed that the Victoria would sink and that the ship must be abandoned and that they abandoned her without any thought of returning or bringing her into port. Nor can there be any doubt that the Victoria, abandoned by

officers and crew without any hope or intention of returning, was a derelict and that the members of the crew of the Owl were salvors. The Laura, 14 Wall. 336, 81 U.S. 336, 20 L.Ed. 813; The Alcazar, D. C., 227 F. 633; The Elizabeth and Jane, Fed.Cas. No. 4,356.

"This being a salvage claim, the jus gentium applies. Mason v. Blaireau, 2 Cranch 240, 6 U.S. 240, 2 L.Ed. 266; The Two Friends, 1 C. Rob. 271; Usatorre v. Compania Argentina Navegacion Mihanovich, supra; The Bee, Fed.Cas. No. 1,219. Contra: The Superior, D. C., 270 F. 283.

"The abandonment of the ship by the master and crew without any hope or intention of returning terminated the voyage and the contractual services of the seamen. Although ordinary seamen are not entitled to salvage awards for saving their own ship because that service is part of their duty, yet they do become entitled thereto when their ship has been abandoned without any hope of recovery. Mason v. Blaireau, supra; Hobart v. Drogan, 10 Pet. 108, 35 U.S. 108, 9 L.Ed. 363; The Georgiana, 1 Cir., 245 F. 321; The Umattilla, D. C., 29 F. 252; The Two Catherines, Fed.Cas. No. 14,288; Cf. The C. P. Minch, 2 Cir., 73 F. 859; The Macona, D. C., 269 F. 468; The John Perkins, Fed.Cas. No. 7,360; Drevas v. United States, D. C., 58 F.Supp. 1008.

"Respondent's counsel conceded that the Victoria was a derelict when the crew left her and that also under Argentinian law, if a vessel is properly abandoned, members of the crew can go back on board and become salvors. All who were engaged in the enterprise and materially contributed to the saving of the Victoria are entitled to share in the salvage. They are not deprived of that right because another set of salvors refused or neglected to join in the suit. The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870.

"The fact that the United States Government does not seek salvage inasmuch as the vessel and the cargo were under the flag of a sister republic of this hemisphere, The Victoria, 1942 A.M.C. 864, does not prejudice the rights of the co-salvors to their proper proportionate share of an award. The Blackwall, supra.

"The award is apportionable among all the salvors, that is, the crews of the Owl, the Sagamore and the Victoria, all of whom aided in bringing the Victoria into port. The crew of the Owl which discovered the derelict and started her on her voyage to her destination, supplied her with compressed air to start and run her motors, assisted in making the necessary repairs and convoyed her part way to New York, would be entitled to the largest part of the award, but seeks no award.

"Though the Victoria was not an uncontrolled derelict when the libellants returned as salvors, they were called upon to assist in bringing the Victoria safely into port. They made minor repairs and rendered some services in addition to those rendered by them before their ship was struck by torpedoes. This entitles them to some award, though not to a very substantial amount.

"It has been stipulated that the value of the Victoria, when brought into port was $1,150,000. An award of $115,000 or 10 per cent. of her stipulated value, 83 per cent. distributable to the crews of the Owl and the Sagamore and 17 per cent. thereof or $19,950 to the crew of the Victoria, amounting to about $500 for each member of that crew, seems reasonable to the court. See The Lamington, 2 Cir., 86 F. 675, 685.

"After the Victoria reached port, the libelants remained aboard the ship as members of her crew. About May 7, 1942, they consented in writing to continue the voyage under the command of Captain Isequilla, who replaced Captain Salamone. This consent given after the voyage was broken up by abandonment of the ship did not constitute a continuance of their former contractual employment but an entirely new arrangement. Thorson v. Peterson, C. C., 14 F. 742; The Helen Fairlamb, D. C., 251 F. 412.

"After libellants filed their libel for salvage, Captain Isequilla threatened that on their return to Argentina libellants would suffer the consequences of bringing suit for salvage in an American court, that they would lose their wages, that their seamen's papers would be taken from them and that some of them would be put in jail. Though the respondents furnished the libellants

with clothes and made some advances to some of them, if refused or neglected after demand to pay wages to others. In these circumstances the libellants were justified in leaving the ship without forfeiting their wages or being considered deserters. Bush v. The Alonzo, Fed.Cas.No.2,223. See The City of Norwich, 2 Cir., 279 F. 687, 692, L.R.A. 1918C, 795.

"While in a harbor of the United States, the Victoria was subject to the laws of the United States, Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306, and this court has jurisdiction of the action brought by the libellants to recover wages and penalties. Secs. 596, 597, Title 46 U.S.C.A.; Strathearn S.S. Co. v. Dillon, 252 U.S. 348, 40 S.Ct. 350, 64 L.Ed. 607; The Sonderborg, 4 Cir., 47 F.2d 723, certiorari denied [Akties Dampskibsselskabet Donneborg v. Mikkelsen], 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527. The provision of the Argentine Code, Article 1016, that no member of the crew may bring proceedings against the ship until the voyage is over under pain of loss of pay due is in contravention of these sections and ineffective when the ship is in a harbor in the United States. Lakos v. Saliaris, 4 Cir., 116 F.2d 440; Glandzis v. Callinicos, 2 Cir., 140 F.2d 111. Moreover, the inability of the Victoria to continue its return voyage to Buenos Aires after her acquisition by the United States on payment of $1,750,000 is no reason for depriving the libellants of the right to bring an action to recover wages in this court under an agreement made or renewed in the United States.

"Since the record does not sufficiently establish the amount of wages and penalties to which each of the libellants is entitled, the court in the absence of a stipulation will, in accordance with the suggestions of the proctors, appoint a commissioner to determine the same."

In his formal findings, the judge said, inter alia, "At about 7.00 A. M. of April 19, 1942, the 'Owl' picked up lifeboat No. 1 and transferred the crew of the lifeboat to the 'Victoria,' when the crew volunteered to board the ship, and returned the eight men to the 'Owl,' leaving the 'Victoria' in command of her chief officer. * * * At 6.00 P. M. on April 19, the United States destroyer 'Nicholson' picked up lifeboat No. 2 and transferred her crew to the 'Victoria.'"

In his Conclusions of Law, the judge said, inter alia, "That when members of the crew of the 'Owl' went on board her they were acting as salvors. * * * That when the members of the crew returned to the 'Victoria' after having abandoned the ship they returned as salvors."

Burlingham Veeder Clark & Hupper, of New York City (Eugene Underwood and Hervey C. Allen, Jr., both of New York City, of counsel), for appellant.

William L. Standard, of New York City (Jacquin Frank and Louis R. Harolds, both of New York City, of counsel), for appellees.

Before L. HAND, Chief Judge, and CHASE and FRANK, Circuit Judges.

FRANK, Circuit Judge.

## I

### The Salvage Claims

1. If, as the trial judge held, the jus gentium applies, then, regarding the decisions of our courts as reflecting it, libellants would seem clearly to be salvors. According to those decisions, abandonment by the master, in the face of what he deems a disaster, without expectation of returning, severs the crew's employment contract even if, subsequently, the vessel turns out to be safe and the crew then returns.[1] That rule would apply here. There was ample evidence to support the finding that the men in lifeboat No. 1 volunteered. The judge did not explicitly so find as to lifeboat No. 2; but that finding is implied in his Conclusions of Law, and the evidence is enough to support such a finding.

---

[1] The C. P. Minch, 2 Cir., 73 F. 859, 862-863, 865; The Georgiana, 1 Cir., 245 F. 321, 324, 325; The Umattilla, D.C., 29 F. 252; The Macona, D.C., 269 F. 468.

2. But while the district court had discretion to take jurisdiction,[2] and that discretion has been said to be justified "because salvage is a question arising under the jus gentium and does not ordinarily depend on the municipal laws of particular countries,"[3] we think that whether, on the facts as found, the crew were "released from any obligation to exert themselves for the benefit of the vessel,"[4] must be determined, as a matter of the "internal economy" of the ship, by the Argentine law, the "law of the flag."[5]

3. For us, Argentine law is a fact. With respect to that fact, defendant introduced the testimony of an expert witness. He is an American and a member of the New York Bar, and of the Bars of Cuba and Puerto Rico. He studied civil law for forty years. He has a degree of Doctor of Civil Laws from the University of Havana. He was a judge in Puerto Rico for seven years, and a member for two years of a commission that drafted new legislation for Cuba. He has studied Argentine law, and is the author of a digest of that law appearing in the Martindale-Hubbell Law Directory. He has not practiced admiralty or maritime law anywhere, but has "occasionally given advice on maritime law" in Latin-American countries. He is authorized to practice in no Latin-American countries except Cuba, but can give advice in other such countries.

He testified that Article 929 of the Argentine Code of Commerce reads: "A captain is forbidden to abandon his ship, whatever may be the danger, except in case of shipwreck." He also said that the pertinent portions of the Code relating to termination of the employment contract between seamen and their ship are contained in Articles which provide that the contract is terminated in the case of "any disaster happening to the vessel which absolutely renders it incapable of navigation." According to the expert witness, this means that the captain's judgment that the vessel is in such condition is not conclusive, but that the sole test is the actual objective fact as to the ship's condition. ("The final decision is the fact of whether the vessel remained fitted for navigation.") It was the witness' opinion that, on the facts here, under Argentine law the libellants' contract was not ended when the captain ordered them to abandon the ship, although the men were obliged to obey that order.

According to this witness, Latin-American courts pay little attention to court decisions as percedents. He had found "practically nothing" by way of decisions of the Supreme Court of the Argentine bearing on the Code provisions in question, in part because of the difficulty of finding such decisions since they are "badly indexed" or "digested." He relied, as, he said, Argentine lawyers do, on the "commentators," especially including the French commentators because, he said, the Argentine Code of Commerce is based on the French law. Where there was a difference of opinion between commentators, he had made a choice. In his testimony, he cited no commentators, but merely gave his interpretation of uncited commentators' interpretations of the Code.

The judge is not bound to accept the testimony of a witness concerning the

2 Charter Shipping Co. v. Bowring, Jones & Tidy, 281 U.S. 515, 50 S.Ct. 400, 74 L.Ed. 1008; Canada Malting Co. v. Paterson Steamships, Ltd., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837; The Falco, 2 Cir., 20 F.2d 362; Usatorre v. Compania Argentina Navegacion Mihanovich, D.C., 49 F.Supp. 275, 276-277.

3 The Bee, 3 Fed.Cas., page 41, at page 43, No. 1,219.

4 See The Georgiana, 1 Cir., 245 F. 321, 325.

5 The Superior, D.C., 270 F. 283; cf. The City of Norwich, 2 Cir., 279 F. 687, 691, L.R.A.1918C, 795; O'Neill v. Cunard White Star, 2 Cir., 160 F.2d 446; The Scotland, 105 U.S. 24, 26 L.Ed. 1001; The Belgenland, 114 U.S. 355, 5 S.Ct. 860, 29 L.Ed. 152; United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071; Cunard S. S. Co. v. Mellon, 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894, 27 A.L.R. 1306; Thompson Towing & Wrecking Association v. McGregor, 6 Cir., 207 F. 209, 217-219; Rainey v. New York & P. S. S. Co., 9 Cir., 216 F. 449, 454, L.R.A.1916A, 1149; The Hanna Nielsen, 2 Cir., 273 F. 171; Grand Trunk R. Co. v. Wright, 6 Cir., 21 F.2d 814; Cain v. Alpha S. S. Corporation, 2 Cir., 35 F.2d 717.

meaning of the laws of a foreign country,[6] especially when, as here, the witness had never practiced in that country.[7] Moreover, as defendant says in its brief, this witness "relied strictly upon the Code provisions." As already noted, he gave little or no attention to Argentine decisional material. We have no knowledge of Argentine "law," nor more than a vague acquaintance with the judicial methods there prevailing. But casual readings of readily available material clearly indicate that, in all civil-law countries, despite conventional protestations to the contrary, much law is judge-made, and the courts are by no means unaffected by judicial precedents or "case law" (which the civilians call "jurisprudence," as distinguished from the interpretation of text-writers or commentators, called "doctrine").[8] Recaséns Siches, a widely respected professor of law in Spain for many years, now in Mexico, recently wrote: "Now jurisprudence, that is, the decisions of the courts, has had the part of greatest protagonist in the formation of the law; and, although in much less volume, it continues today of great importance."[9] "Both the slavish obedience of [civilian] judges to codes, and their freedom from precedent are largely a myth," writes Friedman. "In truth, while there is greater freedom towards the provisions of codes, there is also much greater respect for judicial authority than imagined by most Anglo-American lawyers."[10] A recent treatise by Cossio, a distinguished Argentine lawyer, shows that this attitude prevails in the Argentine.[11]

The expert witness' adherence to the literal words of the code may have caused the trial judge to question his conclusions. For, we are told, the civilians, influenced by an interpretative theory which derives from Aristotle[12] (and which has affected

[6] Viesca Y Compania v. Pan American P. & T. Co., 2 Cir., 83 F.2d 240, 242; Moscow Fire Ins. Co. v. Bank of New York & Trust Co., 280 N.Y. 286, 306, 20 N.E.2d 758, cf. Eastern Building & Loan Association v. Williamson, 189 U.S. 122, 126, 127, 23 S.Ct. 527, 47 L. Ed. 735.

[7] H. T. Cottam & Co. v. Commission Reguladora, 149 La. 1026, 90 So. 392, 394; cf. Guaranty Trust Co. of New York v. Hannay, 2 Cir., 210 F. 810, 813; Manchester Liners v. Virginia-Carolina Chemical Co., D.C., 194 F. 463, 472.

[8] See Lobingier, Precedent in Past and Present Legal Systems, 44 Mich.L.Rev. (1946) 955; 40 C.J. (1926). Modern Civil Law, 1242, 1250, notes, Lobingier; 58 C.J.S., page 840.

Although "stare decisis went to seed in the late Roman law" (Lobingier, 44 Mich.L.Rev. at 957), it had much influence earlier. See Radin, Anglo-American Legal History (1936) 352, citing the rescript of Severus (Dig. 1, 3, 38): "The authority of a continuous number of similar decisions should be regarded as equivalent to that of a statute"); Radin, The Trail of The Calf, 32 Cornell L. Q. (1946) 137, 139 note 2.

As to modern civil-law countries, see, e.g., Dicey, Law and Opinion in England (2d ed. 1914) 487; Soule, Stare Decisis in Continental Europe, 19 Green Bag (1907) 460; Henry, Jurisprudence Constante and Stare Decisis Contrasted, 15 Amer. Bar Ass'n. J. (1929) 11; Allen, Law in The Making (2d ed. 1930) 125; Coxe, Decisions in France, 16 Green Bag (1904) 449; Goodhart, Precedent in English & Continental Law, 50 L.Q.Rev. (1934); Radin, Case Law and Stare Decisis, 33 Col.L.Rev. (1933) 199; Radin, The Trail of The Calf, 32 Cornell L.Q. (1946) 137, 144, note 15; Ireland, Precedent's Place in Latin Law, 40 W.Va.L.Q. (1934) 115; Borchard and Sturnberg, Guide to Law and Legal Literature of France (1931) 18-19; Pollock, Introduction, Progress of Continental Law in the 19th Century (1918).

[9] Recaséns, Human Life, Society and Law, in the volume Latin-American Legal Philosophy (1948) 7, 170.

[10] Friedman, Legal Theory (1944) 295.

[11] See Cossio, Phenomenology of The Judgment, in the volume Latin-American Legal Philosophy (1948) 345; a different translation appears in the volume Interpretations of Modern Legal Philosophies (1947) 85.

[12] See Aristotle, Nicomachean Ethics, Bk. V, Ch. 10, 1137b: The "equitable is indeed 'just' but not equivalent to the 'legal.' It is rather an improvement on the merely legally-just. The reason is that every statute speaks in general terms, but there are some cases upon which it is impossible to make a universal statement which will be correct. In those cases, then, in which it is necessary to speak generally but not possible to do so correctly, the statute embraces only the majority of cases, although well-knowing the possibility of error. Nor is it the less correct on this account; for the fault is not in the statute nor in the legislature. but in the

Anglo-American practice as well[13]) are accustomed to interpret their statutory enactments "equitably," i. e., to fill in gaps, arising necessarily from the generalized terms of many statutes, by asking how the legislature would have dealt with the "un-

---

nature of the subject matter. For it is plainly impossible to pronounce with complete accuracy upon such a subject matter as human action. Whenever, then, the statute reads in general terms, but a case arises which is not covered by the general statement, then it is right, where the legislator's rule is inadequate because of its over-simplicity, to correct the omission which the legislator, if he were present, would admit, and, had he known it, would have put into his statute. That which is equitable, then, is just, and better than one kind of justice, not better than absolute justice but better than the error that arises from legal generality. This is in fact the nature of the equitable; it is a correction of the statute where it is defective owing to its generality."

See also Aristotle's Rhetoric, Bk. I, Ch. 13: "We saw that there are two kinds of right and wrong conduct towards others, one provided for by written ordinances, the other by unwritten. We have now discussed the kind about which the laws have something to say. The other kind has itself two varieties. * * * The second kind makes up for the defects of a community's written code of law. This is what we call equity; people regard it as just; it is, in fact, the sort of justice which goes beyond the written law. Its existence is and partly is not intended by legislators; not intended, where they have noticed no defect in the law; intended, when they find themselves unable to define things exactly, and are obliged to legislate as if that holds good always which in fact only holds good usually; or where it is not easy owing to the endless possible cases presented * * * —a lifetime would be too short to make out a complete list of them. If, then, a precise statement is possible and yet legislation is necessary, the law must be expressed in wide terms. * * * Equity bids us to think less about the laws than about the man who framed them, and less about what he said than about what he meant * * *"

Aristotle's thesis apparently reflected the practice of the Greeks of his time which, in turn, was much affected by the jury system. "In the Greek administration of law," wrote Wigmore, "the emphasis was less on the strict law than on the general justice of the case." Wigmore, A Panorama of The World's Legal Systems (1928) I, 324. See Vinogradoff, Historical Jurisprudence (1922)

II, 11-12, 49, 65-69, 144-145; Frank, If Men Were Angels (1942) 201-202, 370 note 40.

Cf. Guiseppi v. Walling, 2 Cir., 144 F.2d 608, 615-623, 155 A.L.R. 761; Commissioner v. Beck's Estate, 2 Cir., 129 F. 2d 243, 245, Note 4; McAllister v. Commissioner, 2 Cir., 157 F.2d 235, 237, 240, Note 6; Frank, If Men Were Angels (1945) 197-202, 350-353; Frank, Words and Music, 47 Col.L.R. (1947) 1260.

13 The Aristotelian interpretative device was borrowed by the Roman lawyers and used by them until the later Empire. See Kiss, Equity and law, in the volume Science of Legal Method (1917) 146.

Note the maxim, Summum jus, summum injuria. As to the relation of that maxim to "aequitas" in Roman law, see Berolzheimer, The World's Legal Philosophies (1912) 83-86.

For an account of how, after it appeared in Thomas Aquinas' Summa Theologica, the Aristotelian thesis was revived in the 16th century on the European Continent and in England, see Thorne, A Discourse Upon The Statutes (1942).

Plowden explicity enunciated the doctrine of the "equity of a statute" in his comments on Eyston v. Studd, [1574] 2 Plowden, 450, 465-467, 75 Eng. Rep. 688, 695-699: "From this judgment and the cause of it, the reader may observe that it is not the words of the law, but the eternal sense of it that makes the law, and our law (like all others) consists of two parts, viz. of body and soul; the letter of the law is the body of the law, and the sense and reason of the law is the soul of the law, quia ratio legis est anima legis. And the law may be resembled to a nut, which has a shell and a kernel within, the letter of the law represents the shell, and the sense of it the kernel, and as you will be no better for the nut if you make use only of the shell, so you will receive no benefit by the law, if you rely only upon the letter, and as the fruit and profit of the nut lies in the kernel, and not in the shell, so the fruit and profit of the law consists in the sense more than in the letter. And it often happens that when you know the letter, you know not the sense, for sometimes the sense is more confined and contracted than the letter, and sometimes it is more large and extensive. And equity, which in Latin is called equitas, enlarges or diminishes the letter according to its discretion * * * The sages

provided case." [14] In civil-law countries, "there are countless examples of judicial interpretation of statutes * * * which gave the statutory interpretation a meaning either not foreseen by or openly antagonistic to the opinions prevailing at the time of the Code, but in accordance with modern social developments or trends of public opinion. This attitude finds expression in Art. I of the Swiss Civil Code [of 1907][15] which directs the judge to decide as if he were a legislator, when he finds himself faced with a definite gap in the statute."[16]

---

of our law, who have had the exposition of our Acts of Parliament, have in these and many other cases, almost infinite restrained the generality of the letter of the law by equity, which seems to be a necessary ingredient in the exposition of all laws. For (as Aristotle says), cum de toto genere lex dicit, atque aliquid iis in rebus contra generalem legis comprehensionem existit, tum percommode accidit ut qua parte scriptor missum sit corrigatur, quod etiam legislator, si adesset, admoneret, etiamsi jam legem tulisset. And experience shows us that no law-makers can foresee all things which may happen, and therefore it is fit that if there is any defect in the law, it should be reformed, by equity, which is no part of the law, but a moral virtue which corrects the law * * * And in order to form a right judgment when the letter of a statute is restrained, and when enlarged, by equity, it is a good way, when you peruse a statute, to suppose that the law-maker is present, and that you have asked him the question you want to know touching the equity, then you must give yourself such an answer as you imagine he would have done, if he had been present * * * And therefore when such cases happen which are within the letter, or out of the letter, of a statute, and yet don't directly fall within the plain and natural purport of the letter, but are in some measure to be conceived in a different idea from that which the text seems to express, it is a good way to put questions and give answers to yourself thereupon, in the same manner as if you were actually conversing with the maker of such laws, and by this means you will easily find out what is the equity in those cases. And if the law-maker would have followed the equity, notwithstanding the words of the law (as Aristotle says he would, for he says, quod etiam legislator, si adesset, admoneret, etiamsi jam legal talisset) you may safely do the like, for while you do no more than the lawmaker would have done, you do not act contrary to the law, but in conformity with it."

As to Plowden and "equitable interpretation" in America, see Slifka v. Johnson, 2 Cir., 161 F.2d 467, 470; cf.

Radin, The Trail of the Calf, 32 Cornell L. Q. (1946) 137, 139-140. See also footnote 16, infra.

Mr. Justice Story, Equity Jurisprudence (1835) §§ 3 to 8, discussing "equitable interpretation," cites and discusses Aristotle and his many derivatives in Rome, on the Continent, and in England. See also Shelby v. Guy, 11 Wheat. 361, 366-368, 369, 6 L.Ed. 495.

[14] See, e.g., Kiss, loc. cit.; Wurzel, Methods of Juridical Thinking, in the volume, The Science of Legal Thinking (1917) 286, 322-323; Lambert, Codified Law and Case Law, in the same volume, 251; Alvarez, Methods For Codes, in the same volume, 429; cf. Frank, Law and The Modern Mind (1930) 186-192, 310; Demogue, Analysis of Fundamental Notions, in Modern French Legal Philosophy (1916).

The recognition of the Aristotelian theory in Latin-America appears in a recent essay by Garcia Maynez, an influential scholar; see The Philosophico-Juridical Problem, in the volume, Latin-American Legal Philosophy (1948) 461, 502-503, where Aristotle is quoted and discussed.

[15] It reads: "The statute governs all matter within the letter or spirit of any of its mandates. In default of an applicable statute, the judge is to pronounce judgment according to the customary law, and in default of custom according to the rules which he would establish if he were to assume the part of a legislator. He is to draw his inspiration, however, from the solutions of the learned [la doctrine] and the jurisprudence of the courts [la jurisprudence]."

[16] Friedman, Legal Theory (1944) 294.

Friedman notes that the Swiss-Code provision almost duplicates Plowden's comments. Naturally enough, since both stemmed from Aristotle.

Cardozo wrote, "I think the tone and temper in which the modern judge should set about his task are well expressed in the first article of the Swiss Code of 1907 * * *" Cardozo, The Nature of The Judicial Process (1921) 140.

Mr. Justice Jackson recently, in State Tax Commission of Utah v. Aldrich, 316 U.S. 174, at page 202, note 23, 62 S.Ct. 1008, at page 1022, 86 L.Ed. 1358, 139 A.L.R. 1436, referred to that article of

■ In a colloquy which occurred aft- er the judge had filed his opinion, he expressed himself as in disagreement with the witness' interpretation of the

that code as a "candid recognition of what necessarily is the practice" of courts.

Our interpretative methods seem to be somewhat less latitudinarian than those of the civilians. See, e.g., Cox, Learned Hand and The Interpretation of Statutes, 60 Harv.L.Rev. (1947) 370; Frankfurter, Some Reflections on The Reading of Statutes, 47 Col.L.Rev. (1947) 527; Frank, Words and Music, 47 Col.L.Rev. (1947) 1260. And see Hall, Principles of Criminal Law (1947) 36 et seq. to the effect that in criminal cases broad interpretation (by reference to what the legislature would have done, etc.) has not been and should not be used; see United States v. Wiltberger, 5 Wheat. 76, 96, 5 L.Ed. 37; McBoyle v. United States, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816.

However, that—probably thanks to the influence of Plowden, in adopting and adapting the Aristotelian theory—our present mode of statutory interpretation in non-criminal cases is not poles apart from the civilians' appears from the comments in Cardozo, The Nature of The Judicial Process (1921) 120, 140, and also from the following remarks of Judge L. Hand: "It seems a simple matter, especially when the law is written down in a book with care and detail, just to read it and say what is its meaning. Perhaps this could be made as easy as it seems, if the law used language coined expressly for its purposes, like science, or mathematics, or music. But that would be practically undesirable, because while the government's commands are to be always obeyed, still they should include only what is generally accepted as just, or convenient, or usual, and should be stated in terms of common speech, so that they may be understood by those who must obey, and may not appear foreign to their notions of good or sensible conduct. Besides, even if the law had a language of its own, it could not provide for all situations which might come up. Nobody is so gifted with foresight that he can divine all possible human events in advance and prescribe the proper rule for each * * * The judge must therefore find out the will of the government from words which are chosen from common speech and which had better not attempt to provide for every possible contingency. How does he in fact proceed? Although at times he says and believes that he is not doing so, what he really does is to take the language before him, whether it be from a statute or from the decision of a former judge, and try to find out what the government or his predecessor would have done, if the case before him had been before them. He calls this finding the intent of the statute or of the doctrine. This is often not really true. The men who used the language did not have any intent at all about the case that has come up; it had not occurred to their minds. Strictly speaking, it is impossible to know what they would have said about it, if it had. All they have done is to write down certain words which they mean to apply generally to situations of that kind. To apply these literally may either pervert what was plainly their general meaning, or leave undisposed of what there is every reason to suppose they meant to provide for. Thus, it is not enough for the judge just to use a dictionary. If he should do no more, he might come out with a result which every sensible man would recognize to be quite the opposite of what was really intended; which would contradict or leave unfulfilled its plain purpose. Thus, on the one hand, he cannot go beyond what has been said, because he is bound to enforce existing commands and only those; on the other, he cannot suppose that what has been said should clearly frustrate or leave unexecuted its own purpose. This is his frequent position in cases that are not very plain; that is to say, in the greater number that arise. As I have said, there are two extreme schools, neither one of which is really willing to apply its theory consistently, usually applying it when its interests lie along the path it advocates. One school says that the judge must follow the letter of the law absolutely. I call this the dictionary school. No matter what the result is, he must read the words in their usual meaning and stop where they stop. No judges have ever carried on literally in that spirit, and they would not be long tolerated if they did * * * The other school would give them almost complete latitude. They argue that a judge should not regard the law; that this has never really been done in the past, and that to attempt ever to do it is an illusion. He must conform his decision to what honest men would think right, and it is better for him to look into his own heart to find out what that is. As I have already said, in a small way some such process is inevitable when one is interpreting any written words. When a judge tries to find out what the government would have intended which it did not say, he puts into its mouth things which he thinks it ought to have said, and that is very

Code.[17] But, doubtless because the judge thought the jus gentium governed, he did not make a finding as to Argentine law. We must therefore reverse and remand for such a finding. Perhaps it can be made without further testimony on the subject. It may be that, if he considers it desirable, some arrangement will be agreed upon which will enable the judge to summon an expert of his own choosing.

■ 3. A majority of the court think that, assuming that the men were salvors, the amount of the award is excessive and should be no more than $200 apiece, because the men were in no danger, as a navy vessel accompanied the ship to New York, and because their activities were not markedly different from those they would have performed under their employment contract. The writer of this opinion thinks that this court should not alter the amount allotted by the trial judge whom we know to be cautious and conservative.

## II

### The Wage Claims

1. Defendant, in its brief in this court, asserts that the wages were forfeited not because the men had brought the salvage

---

close to substituting what he himself thinks right. Let him beware, however, or he will usurp the office of government, even though in a small way he must do so in order to execute its real commands at all * * * But the judge must always remember that he should go no further than he is sure the government would have gone, had it been faced with the case before him. If he is in doubt, he must stop, for he cannot tell that the conflicting interests in the society for which he speaks would have come to a just result, even though he is sure that he knows what the just result should be. He is not to substitute even his juster will for theirs; otherwise it would not be the common-will which prevails, and to that extent the people would not govern. So you will see that a judge is in a contradictory position; he is pulled by two opposite forces. On the one hand he must not enforce whatever he thinks best; he must leave that to the common will expressed by the government. On the other, he must try as best he can to put into concrete form what that will is, not by slavishly following the words, but by trying honestly to say what was the underlying purpose expressed. Nobody does this exactly right; great judges do it better than the rest of us. It is necessary that someone shall do it, if we are to realize the hope that we can collectively rule ourselves." L. Hand, How Far Is a Judge Free in Rendering a Decision? in Law Series I, Lect. No. 14, National Advisory Council on Radio In Education (Un. of Chi. Press, 1933).

It has been remarked that codification —because it compels interpretation to fill in gaps—leads to more judicial creativeness than "unwritten law." See Calhoun, Greek Legal Science (1944) Ch. 4; Seagle, The Quest For Law (1941) 116, 298; Hornblower, A Century of 'Judge-Made' Law, 7 Col.L.Rev. (1907) 453, 464; Frank, Book Review, 57 Harv.L. Rev. (1944) 1120, 1122.

17 The colloquy was as follows:

"The Court: How about the question of damages? Let us go to that. The question of what law applies is a real point of law there.

"Mr. Underwood: Yes. I am sorry your Honor did not discuss it in your opinion. If your Honor please, here is an Argentine ship on the high seas beyond the realm of any sovereign—an Argentine contract between an Argentine ship owner and an Argentine crew. It is American law that what it takes to break the contract must be determined by the Argentine law. That is the American law.

"The Court: You are right, yes.

"Mr. Underwood: Your Honor did not discuss or decide that question.

"The Court: All questions of discipline must be tried by the jurisdiction whose flag is being flown but in my case there is a further element, that the ship was here and could have been libeled here, couldn't it?

"Mr. Underwood: It was.

"The Court: If it was libeled here didn't this Court have jurisdiction to go into the question of whether there was a—

"Mr. Underwood. There is no doubt but what the Court had jurisdiction because the vessel was actually seized, but having jurisdiction, the Court, in my view, should decide the issues between the parties over whom it has jurisdiction according to the law of the land.

"The Court: I see what you mean.

"Mr. Underwood: Which is that when you have an occurrence between foreigners on the high seas the law of the flag of the ship controls the effect of the acts.

"The Court: Even under the law as I construe it I can distinguish every one of the statutes and regulations showing

suit but solely because their departure from the vessel in July was "an unjustifiable desertion." We take it, then, that defendant does not contend that, even under Argentine law, the men lost the 'right to their wages through the institution of the salvage action.[18] Accordingly, we disregard, with reference to the alleged forfeiture of wages, the following provision of Article 1016 of the Argentine Code: "No member of the crew may bring proceedings against the ship or captain until the voyage is over, under pain of loss of pay due."[19] We have grave doubts whether, on grounds of public policy, such a provision should be recognized by our courts; but, in the light of defendant's concession, we need not consider that question. We understand that defendant concedes that, if the men did not unjustifiably desert, Article 1016 of the Argentine Code did not prevent recovery in a suit for wages in an American court.[20]

The judge found, and there is enough evidence to support his finding, that the captain told the men that they would lose their wages because they had brought the salvage suit. If our law controls, that statement was a repudiation of the contract, which justified the men in leaving the vessel, without any resultant forfeiture of wages. However, the defendant's expert witness seems to have testified that such is not the Argentine law, and we think that, on that issue, Argentine law governs.[21] As already noted, the trial judge apparently concluded that this witness' views of Argentine law were incorrect. Perhaps that suffices to settle the matter. However, as we are remanding in any event, we think it would be well if the judge were to make a finding as to the applicable Argentine law on that point. The judge, in that connection, should also consider the effect of the threat, found by him to have been made, that, for bringing the salvage suit, the men's "seamen's papers would be taken from them and that some of them would be put in jail."[22]

2. Because of the lack of clarity of the applicable legal rules, we think that the captain had "sufficient cause" to refuse payment of wages, so that it was error to award any penalty under 46 U.S.C.A. § 596. Glandzis v. Callinicos, 2 Cir., 140 F.2d 111, 114-115.

Reversed and remanded.

---

they do not hold in favor of the ship— every one of them. I will admit that this expert, if he is a good expert, why I would go contrary to what he says but I distinguish each and every rule and regulation."

[18] The brief says: "But we do not contend that accrued wages were forfeited because the crew had brought suit for salvage, but rather because their departure from the vessel on July 6 was an unjustifiable desertion, the penalty for which is forfeiture of wages."

[19] We note in passing that, if the earlier departure from the ship at sea terminated the contract then existing, the voyage to which that contract related was over when the men brought the salvage suit.

[20] In any event, the district court had discretion to take jurisdiction of the suit. See footnote 2, supra.

[21] Article 1016 of the Argentine Code provides: "Nevertheless, if the ship is in a good port, maltreated individuals or those to whom the captain has failed to supply the provisions to which they are entitled may apply for rescission of the contract."

The expert testified that such an application must be made to the Consul, but that the threats here made did not constitute "maltreatment." If that is a correct interpretation, then, since an application to the Consul would have been futile, the failure of the men to make it is of no moment.

Moreover, there is some evidence that, in June, 1947, the Consul had told some of the men that he would not entertain any petition because they had brought the salvage suit, and that, on that account, those men "and the rest of the crew would be revoked." (sic).

[22] There is evidence that at least some of the men were excluded from the ship in July. If so, then, in any event, they did not desert. But the judge made no finding on that score. A finding of that fact, if favorable to any of the plaintiffs, would dispose of the desertion issue as to him.

Should the judge decide that the libellants were not salvors but continued to be members of the crew until they reached New York, he will, of course, need to recompute the amount of the wages due them for that part of the voyage.